FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

Sept 1

2017 AUG 32  AM 10: 02

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO FLORIDA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. LORNE HOLLAND and MICHELLE TAYLOR, | ) ) ) | |
| | ) | Case No. 6:17-cv-1592-ORL- |
| Plaintiffs-Relators, | ) ) | **JURY TRIAL DEMANDED** **FILED UNDER SEAL** 18 TBS |
| v. | ) ) | |
| DAVITA HEALTHCARE PARTNERS, INC.; DAVITA, INC.; TOTAL RENAL LABORATORIES, INC.; DVA LABORATORY SERVICES, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Relators Lorne Holland, M.D. and Michelle Taylor, D.O. ("Relators"), on behalf of

themselves and the United States of America, bring this action under 31 U.S.C. §§ 3729-3732

("False Claims Act") to recover all damages, penalties, and other remedies established by the

False Claims Act on behalf of the United States and themselves. By and through their counsel,

Relators hereby file this False Claims Act Complaint and Demand for Jury Trial ("Complaint")

against Defendants DaVita Healthcare Partners, Inc., DaVita, Inc., Total Renal Laboratories, Inc.,

and DVA Laboratory Services, Inc., and allege as follows:

### NATURE OF ACTION

1.      Relators bring this action on behalf of the United States of America against Defendant for

its violations of the federal False Claims Act ("federal FCA"), 31 U.S.C. §§ 3729, *et seq*.

### JURISDICTION AND VENUE

2.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729, *et seq*.

3.      This court has jurisdiction over the claims arising under the federal FCA pursuant to 31

U.S.C. §§ 3732(a) and 3730(b), and 28 U.S.C. §§ 1331 and 1345.

4.       Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts

proscribed by 31 U.S.C. §§ 3729, *et seq.*, and complained of herein, took place in this District.

## PARTIES

5.       Relator Lorne Holland, M.D. was hired in September 2014 as Total Renal Laboratories,

Inc., and DVA Laboratory Services, Inc. Chief Laboratory Officer. In December 2014, he was

asked to also assume responsibilities as Vice President of Operations, and in July 2015, he was

named Clinical Laboratory Improvement Amendments ("CLIA") Medical Director.

6.       In this role, Relator Holland repeatedly refused to approve processes that, in his medical

judgment, would compromise patient care.

7.       Ultimately, he grew weary of the constant battle to stop unethical behavior and resigned

his position as CLIA Medical Director in March 2017.

8.       Relator Michelle Taylor, D.O. was hired by Total Renal Laboratories, Inc., and DVA

Laboratory Services, Inc. as Interim Director for Special Projects in January 2016. Upon Dr.

Holland's resignation in March 2017, she was named CLIA Medical Director, but within four

months, she herself resigned over the same issues, with her resignation effective July 19, 2017.

9.       Defendant DaVita, Inc. is a leading provider of dialysis services in the United States,

treating patients with chronic kidney failure ("CKF") and end stage renal disease ("ESRD").

10.      DaVita, Inc.'s corporate headquarters is located at 2000 16th St., Denver, CO 80202.

11.      As of December 2016, DaVita, Inc. provided dialysis services for approximately 187,700

patients at 2,350 outpatient dialysis centers located in the District of Columbia and 46 states:

Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts,

Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

12.     Defendant Total Renal Laboratories, Inc. (NPI number 1255335535) and DVA Laboratory Services, Inc. (NPI number 1730149709) (collectively "DaVita Labs") handle all of the laboratory testing for DaVita, Inc. dialysis centers except those in Hawaii.

13.     Although DaVita Labs operates exclusively out of Fort Lauderdale, Florida and DeLand, Florida, its corporate address is the same as DaVita, Inc. DaVita Labs performs all of its own billing.

14.     Hereinafter, DaVita Labs and DaVita, Inc. shall be collectively referred to as "DaVita."


## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

15.     As required by the federal FCA, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all material evidence and information related to the Complaint ("Disclosure Statement").

16.     The Disclosure Statement is supported by material evidence known to Relators at the time of their filing, establishing the existence of Defendant's false claims.

17.     The Disclosure Statement includes attorney-client communications and work product of Relators' attorneys and is submitted to the Attorney General of the United States and the United States Attorney for the Middle District of Florida in their capacities as potential co-counsel in this litigation; therefore, the Disclosure Statement is confidential and protected by the joint

prosecutorial privilege.

## FEDERALLY FUNDED HEALTHCARE PROGRAMS

18.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.,* establishes the Health

Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The

Secretary of Health and Human Services ("HHS") administers the Medicare Program through the

Centers for Medicare and Medicaid Services ("CMS").

19.     The Medicare program is comprised of four parts. Medicare Part A ("Hospital

Insurance") provides basic insurance for the costs of hospitalization and post-hospitalization

care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized,

voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient

care, medical supplies, and laboratory services, including facility dialysis treatments. 42 U.S.C.

§§ 1395j--w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private

insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-

21--w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers

approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-

101--w-154.

20.     Reimbursement for Medicare Part B claims is made by the United States through CMS.

CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims

from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act

on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each Current

Procedural Terminology ("CPT") code listed on the Medicare Part B claims.

21.     Over 500,000 Americans suffer from ESRD, or Stage V permanent kidney failure, which

means that their kidney function is so impaired that they must undergo dialysis to survive. The

typical ESRD patient has dialysis treatments three times a week. Each treatment lasts about four (4) hours. The only "cure" for an ESRD patient is a kidney transplant, but there are not enough kidney donors available. ESRD patients are typically very sick and vulnerable.

22.     Most ESRD patients in the United States are treated at dialysis clinics that are part of large, for-profit chains like DaVita. Medicare Part B covers ESRD treatment for individuals who qualify for Social Security benefits; some individuals who are already part of a Medicare Advantage Plan under Part C may elect to continue that coverage. Medicaid provides ESRD benefits for its beneficiaries who do not qualify for Medicare ESRD coverage.

23.     Individuals with health insurance are not eligible for Medicare coverage for the first thirty months of ESRD treatment. Thus, other federal health insurance programs, including the Federal Employees Health Benefit Program (which provides health insurance for federal employees, retirees, and the survivors of such individuals), CHAMPUS/TRICARE (providing health care insurance to individuals and dependents affiliated with the armed forces), and CHAMPVA (providing health care coverage to families of disabled veterans), and Medicare Advantage Plans (Part C) also pay for dialysis and ancillary ESRD treatments. Medicare is a secondary payer during these months. Assays such as those at issue may also be paid by Part A, if an ESRD patient is hospitalized.

24.     In order to receive Medicare funds, enrolled providers like DaVita are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

25.     Among the rules and regulations which enrolled providers like DaVita agree to follow are to: (a) bill Medicare for only those covered services which are medically necessary; (b) not bill Medicare for any services or items which were not performed or delivered in accordance with all

applicable policies, nor submit false or inaccurate information relating to provider costs or

services; (c) not engage in any act or omission that constitutes or results in over-utilization of

services; (d) comply with state and federal statutes, policies and regulations applicable to the

Medicare Program; and (e) not engage in any illegal activities related to the furnishing of

services to recipients.

26.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq*., establishes Medicaid, a

federally assisted grant program for the States. Medicaid enables the States to provide medical

assistance and related services to needy individuals. CMS administers Medicaid on the federal

level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the

services covered, payment levels for services and administrative and operational procedures.

27.     At all times relevant to this Complaint, the United States provided funds to the States

through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§

1396, *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for

payment for covered medical services under the provisions of Title XIX of the 1965

Amendments to the Federal Social Security Act.

28.     By becoming a participating provider in Medicaid, enrolled providers agree to abide by

the rules, regulations, policies, and procedures governing claims for payment, and to keep and

allow access to records and information as required by Medicaid. In order to receive Medicaid

funds, enrolled providers, together with authorized agents, employees, and contractors, are

required to abide by all the provisions of the Social Security Act, the regulations promulgated

under the Act, and all applicable policies and procedures issued by the State.

29.     42 C.F.R. §§ 455, *et seq.*, expressly states that a provider must certify that it is in

compliance with all federal and state statutes and regulations in order to receive payment from

-6-

Medicaid.

30.    At all times relevant to this Complaint, DaVita was enrolled in, and sought reimbursement from, Medicare and Medicaid, as well as other Government-funded programs including, but not limited to, TRICARE, CHAMPVA, Federal Employees Health Benefits Program, and State Children's Health Insurance Programs (collectively referred to herein as "Federal Insurance").

31.    At all times relevant to this Complaint, Federal Insurance constituted a significant source of gross patient revenue for Defendant DaVita.

## CLINICAL LABORATORY IMPROVEMENT AMENDMENTS REGULATIONS

32.    CMS regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments ("CLIA").

33.    CLIA's Laboratory Requirements are codified at 42 C.F.R. § 493 and apply to DaVita's non-research testing of its patients, including, but not limited to, the requirements for the subspecialties of virology, diagnostic immunology, and general immunology.

34.    42 C.F.R. § 493.1251 requires that a "written procedure manual for all tests, assays, and examinations performed by the laboratory must be available to, and followed by, laboratory personnel" that includes "[l]imitations in the test methodology, including interfering substances." 42 C.F.R. § 493.1251(a), (b)(9).

35.    42 C.F.R. § 493.1253(b)(1) requires that "[e]ach laboratory that introduces an unmodified, FDA-cleared or approved test system must do the following before reporting patient test results:  (i) Demonstrate that it can obtain performance specifications comparable to those established by the manufacturer for the following performance characteristics:  (A) Accuracy. (B) Precision.  (C) Reportable range of test results for the test system[,] [and] (ii) [v]erify that the

manufacturer's reference intervals (normal values) are appropriate for the laboratory's patient population."

36.     42 C.F.R. § 493, Subpart I, establishes mandatory proficiency testing programs for non-waived testing, including requirements that a laboratory meet a certain level of accuracy in its testing.

## SPECIFIC ALLEGATIONS

37.     As part of the FDA-approval process, manufacturers of clinical laboratory tests (known as "assays") must clearly state the collection, processing, and storage conditions necessary for acceptable performance of the assay.

38.     These requirements are incorporated into the FDA Package Insert, which accompanies the sale of the assay and prescribes its proper use.

39.     For example, a hypothetical FDA Package Insert may state:

>       Serum is the only acceptable sample type for this assay. Samples are
>       stable for up to 24 hours when stored at room temperature (15-25°C) and
>       up to 1 week when stored refrigerated (2-8°C).

40.     Package Insert instructions are based on large-scale reliability studies that are scrutinized by the FDA as part of the assay approval process.

41.     They represent the limits of the manufacturer's knowledge as to what conditions will produce accurate results.

42.     Deviations from these conditions mean that it would be impossible to say whether the results fall into expected ranges (because there are no normed ranges for those conditions) without further method validation.

43.    Thus, in the example above, if a sample were kept for 48 hours, even if kept at the correct temperature, there is no way to know whether the results would still be accurate or whether a new range of results should be expected, without performing additional method validation.

44.    Similarly, if a sample were tested within 24 hours but stored above room temperature, results would be similarly unreliable.

45.    Even when following manufacturer's guidelines, a laboratory must perform its own validation on each assay using a process established by CLIA '88 and CAP known as "method validation."

46.    If the lab performs testing exactly as prescribed in the assay Package Insert, the method validation for the lab will still include assessments of accuracy, precision, reportable range, and reference intervals.

47.    If the lab wishes to use an assay in a way that deviates from the Package Insert, it is required to prove that such deviations still reliably produce accurate results.

48.    These studies must be completed and the results approved by the CLIA medical director prior to using the assay in the proposed manner.

49.    In addition to manufactured assays, some tests are developed by laboratories for their own use. These are known as laboratory-developed tests ("LDTs").

50.    LDT is also used to refer to the modification of any FDA-approved commercial test. In other words, any deviation from the Package Insert—such as to use the assay to test urine rather than serum, or to test samples stored beyond manufacturer-defined stability or outside manufacturer-defined temperature – are considered modifications and thus are LDTs.

51.   Since a newly-created LDT (or a modification of an existing assay) has not been validated through FDA-approved studies, labs are required to conduct a more thorough method validation before using an LDT.

52.   The federal government, through CLIA, highly regulates the evaluation and use of LDTs.

53.   Moreover, some states (such as New York) have their own method validation requirements that are even more stringent.

54.   Importantly, all method validation studies, regardless of whether they meet or exceed manufacturer guidelines, must be reviewed and approved by the CLIA Medical Director (or an officially documented delegate) before use for patient testing.

55.   DaVita operates two independent laboratories in Florida—one in DeLand ("North") and one in Ft. Lauderdale ("South") (together, the "Florida Labs").

56.   Together, these two Florida Labs handle all testing of samples from dialysis patients in the continental United States. This is true whether a sample is collected at a clinic down the street or at a clinic in California.

57.   Because of DaVita's business decision to transport all samples to the Florida Labs, many if not most samples collected in DaVita clinics have been transported and stored outside of manufacturers' required conditions.

58.   This, in turn, leads to issues of stability of samples.

59.   Stability, as defined by the International Standards Organization (ISO), is the capability of a sample material to retain the initial property of a measured constituent for a period of time within specified limits when the sample is stored under defined conditions.

60.   Simply put, when samples are not maintained within defined conditions, the sample can deteriorate and become unstable at a molecular level.

61.     Testing of such samples is medically worthless and unreasonable, as the deterioration means that the sample is no longer representative of the patient's condition.

62.     Per manufacturer's requirements, published guidelines, and industry standards, microbiology samples sent for culture should not be stored outside of room temperature and should be processed within two hours of collection.

63.     However, transportation and storage process at DaVita are what both Relators describe as "a complete mess."

64.     Every sample that is collected goes through the same processes prior to testing, none of which are tracked; this makes it unclear how long any given sample sits at any given temperature.

65.     At the clinic where samples are collected, there is no required documentation or verification of how long samples sit after collection, and in fact, samples may sit at room temperature for 10 or more hours before being packed.

66.     Moreover, refrigeration is only appropriate for some samples – others should be maintained either at room temperature or frozen – but DaVita's collection guides require all blood-filled tubes to be refrigerated.

67.     At the clinics, samples are packed into boxes with "cool packs" to be sent to the Florida Labs.

68.     A typical shipment takes between fifteen and twenty hours, far longer than the life of the cool pack. Thus, the samples rarely remain at refrigerated temperature for the entire trip.

69.     Without including a temperature monitor in the packaging, there is no way to know (other than temperature at arrival) how much fluctuation occurs.

70. DaVita Labs includes a temperature monitor in six shipping boxes per month, chosen at random. This is inadequate, in the circumstances, to monitor the volume of shipped samples.

71. Accordingly, no data exists to support DaVita's deviation from standard practice.

72. Upon arrival at one of the Florida Labs, all West Coast boxes and any shipments that have been delayed are temperature checked and documented on DaVita's Temperature Verification Forms. For any other shipment, however, only a random sampling of 10% of the boxes are temperature-checked.

73. For those boxes that are checked, temperature is taken via an instrument that records temperature of the box itself, and not the contents.

74. Even more problematically, per common manufacturer definition, a sample is "refrigerated" if it is maintained between 2-8°C. DaVita's Standard Operating Procedures ("SOP"), however, states that samples must be received below 25°C.

75. Most samples arrive at a temperature in the low double digits Celsius, putting them out of the industry standard definition of "refrigerated," but inside DaVita's own SOP.

76. Importantly, for purposes of calculating the refrigerated stability time, there is no way to determine whether the samples were outside of the refrigeration temperatures for a few minutes or for many hours.

77. After they arrive in a Florida Lab, samples are unpacked from boxes en masse, which results in thousands of tubes sitting in plastic containers at room temperature waiting to be received, sorted, and processed. This is known as "accessioning."

78. The first tubes accessioned sit for no more than an hour, but the last tube for the day might sit at room temperature for up to seven hours waiting to be accessioned (in addition to however long it had been unrefrigerated in the shipping box).

-12-

79.    On average, the wait for accessioning is about four hours.

80.    The process used to determine the time since collection to evaluate stability, which is performed during the accessioning process by DaVita Labs' proprietary computer system, is also flawed.

81.    For the purposes of determining stability, sample age is rounded to the closest number of days, rather than a more precise hours and minutes. Accordingly, a pair of samples that are accessioned 24 and 27 hours after collection are both rounded to one day and recorded as if they were being tested the day after collection.

82.    Because of this process, samples that are hours beyond stability storage time at accessioning are recorded as acceptable by the computer system and sent on for testing.

83.    Further, sample collection time is only evaluated when samples are received in the accessioning department. There is a lengthy and variable amount of time between when a sample is accessioned and when it is actually tested.

84.    After being accessioned, tubes are taken to the testing departments to be loaded onto the instruments. Thus, these same thousands of tubes that sat in accessioning at room temperature in plastic bins now sit at room temperature in racks waiting to be loaded for testing.

85.    SOP for Special Chemistry calls for samples to be refrigerated during this phase, but there is no documentation of how rapidly, if at all, the samples are transferred to refrigerated conditions.

86.    Again, the first tubes of the day spend less than an hour in this phase, but some tubes can sit for another six hours or more waiting to be loaded.

87.    After being run on the instruments, the tubes are put back in the same racks and left at room temperature until all the testing is completed for the day.

-13-

88.     This means the samples sit at room temperature for *another* four to twelve hours, depending on whether a sample was among the first or the last tested. Tubes may be pulled from the racks for repeat testing, additional testing, or testing in another department.

89.     As a result of the processes set forth above, no specimen sits at room temperature for fewer than 14 hours. Some samples sit for up to 40 hours.

90.     This is a huge problem since (as noted above) the majority of DaVita's assays have room temperature stability that is *at best* limited to twenty-four hours, and a significant minority are limited to eight hours, while many have no established time that they may be held at room temperature per the manufacturer's approved conditions.

91.     More than forty different tests with strict frozen temperature requirements are routinely received compromised (not frozen), repackaged, and sent out for testing at a reference laboratory, then billed to Federal Insurance.

92.     In addition to these issues, neither the centrifuge procedure for special chemistry testing nor the collection tubes used for general chemistry testing have been validated. In order to adequately separate the cellular elements (red blood cells, white blood cells, and platelets) from the liquid portion of a blood sample (plasma), the manufacturer's instructions for the EDTA tubes used in Special Chemistry testing require that samples be centrifuged for ten minutes at a force of 1500 x g. Separation is critical, because residual cellular elements may adversely affect the testing process.

93.     Against manufacturer's instructions, DaVita Labs' process only calls for centrifugation for 5 minutes, and does not ensure that sufficient centrifugal force is applied. (Centrifugation is defined in terms of Rotations Per Minute (RPM), but different centrifuge models generate different force at the same RPM, and the SOP fails to specify which model is being referenced.)

-14-

94.     DaVita has not performed any validation to determine whether this deviation from manufacturer's requirements adversely affects the reliability of Special Chemistry tests.

95.     In late 2015, DaVita Labs switched collection tubes used for general chemistry testing from larger volume, custom-made gel tubes to smaller, standard gel tubes.

96.     Per the laboratories' accrediting body, a change in the device used for specimen collection requires revalidation of testing methods. However, the change was made without review and approval of validation data by the CLIA MD.

97.     As such, it is unknown if the tube change adversely affected the accuracy of test results.

98.     Notwithstanding that its testing procedures fall outside FDA-approved guidelines and so lack any assurance of valid results, DaVita routinely submits claims to Federal Insurance for payment for these tests.

99.     Senior leadership at DaVita have resisted all efforts by Drs. Holland and Taylor to perform a rigorous assessment of testing methods to determine which are LDTs and which are in need of method validation studies. This is despite the fact that few, if any, of the current DaVita method validation studies contain all the necessary elements set out by CLIA.

100.    In a review of large instruments at the DeLand laboratory, Dr. Taylor discovered unsigned AIQs and AIQs signed by Dr. Ray Franklin, who was not the CLIA medical director and who lacked the authority to sign. Specifically, Dr. Taylor's review showed the following AIQs that were unsigned: Sysmex CA 7000 (2); Clinitek (1); Advia (2). This second list represents AIQs that were signed by Dr. Franklin: Tosoh (6); Diasorin (1); AU5400 (4); Centaur (10); Cobas Ampliprep & Taqman (1); Bactec (27); Microscan (1); Vitek (4); Advia (2); Nexion (1); AU680 (1). The parenthetical represents the number of AIQs that Dr. Taylor found for each instrument.

-15-

101.    Relators believe Dr. Franklin also reviewed other reports that were not within his purview and that were not properly delegated to him, such as correlations and calibrations/verifications.

102.    CMS administers the ESRD Quality Incentive Program (QIP) to promote high-quality services in outpatient dialysis facilities treating patients with ESRD.

103.    The ESRD QIP will reduce payments to ESRD facilities that do not meet or exceed certain performance standards. The maximum payment reduction CMS can apply to any facility is two percent.

104.    Since its inception, the performance standards assessed by the QIP has included laboratory data, including bundled tests.

105.    Serum and plasma BUN, reported as calculated URR or Kt/V, has been a component of the QIP for payment-years 2012 through 2017. Hemoglobin was a component for payment-years 2012 through 2015. Calcium has been included in payment-years 2016 and 2017.

106.    Given the many issues described above with satisfactory method validation and sample stability, the laboratory data submitted for evaluation against the QIP standards may not be accurate.

107.    As such, DaVita received additional treatment revenue from CMS via QIP payments (up to 2%) based on invalid data.

108.    DaVita is well aware of all of these issues.

109.    When Dr. Holland became CLIA MD, he discovered that (contrary to what he had been previously told) there was inadequate method validation for storage and transport issues described herein.

110.    Many of the method validation studies upon which DaVita was relying did not contain the required regulatory elements, were not properly reviewed or signed by the CLIA MD, and in some instances, did not appear to exist at all.

111.    In February 2017, Dr. Holland was presented with a validation packet for a new instrument for testing Hepatitis C RNA by polymerase-chain reaction ("PCR").

112.    While most of the necessary data was satisfactory, he found no reference at all to sample stability.

113.    Further investigation revealed that not only was this important element missing from this validation, but it was also missing from the validations of all previous instruments performing this test.

114.    Investigation showed that this was no accident: manufacturer's requirements for these assays state that the liquid portion of the sample (plasma) must be separated from the cells within 24 hours of collection. With such a lengthy transport time, it was essentially impossible to comply with this requirement using the established collection process.

115.    Nevertheless, DaVita Labs had routinely tested samples it received beyond this 24-hour period, and had done so in the absence of any validation data to show that the additional storage time did not adversely affect the results.

116.    Upon information and belief, a few years prior to Dr. Holland's tenure, a Ph.D. consultant on staff made this same observation and required that clinics "pour off" fluids before sending to the lab, thus attempting to satisfy the 24-hour requirement. However, after that consultant left, the policy was rescinded due to the amount of work it required.

-17-

117.   In March 2017, Dr. Holland, as CLIA MD, tried to enforce the manufacturer-defined

stability requirements for HCV RNA by PCR testing because he could not locate data to support

deviation from the Package Insert.

118.   Dr. Holland received a great deal of pushback from his supervisors, who were more

concerned with the economics of the decision than the adverse effects on quality of results and

compromise to patient care.

119.   Despite the objections, Dr. Holland ultimately was successful in addressing the stability

issues for this test; one of his final acts as CLIA MD was to institute use of more expensive

collection tubes that enhanced stability for HCV testing, and to get his superiors' agreement that

previous HCV RNA by PCR results were of questionable validity and subject to refund.

120.   Upon information and belief, DaVita has since refunded almost $1 million pursuant to

this admission.

121.   However, HCV antibody testing (as opposed to RNA by PCR testing) was subject to the

same stability concerns.

122.   Although DaVita now uses the same more expensive tubes for this test as well, thus

addressing prospective stability issues, it has not refunded any money for previous test results

that were compromised.

123.   Following Dr. Holland's resignation as CLIA MD, Dr. Taylor was asked to fill the role.

124.   Already aware of Dr. Holland's concerns, Dr. Taylor began a systematic review of

DaVita's standard assays to determine whether they were properly authorized.

125.   First, Dr. Taylor reviewed documentation surrounding medical director delegation and

determined that prior to Dr. Holland's appointment, Dr. Gary Pearl (the prior CLIA MD) and Dr.

Ray Franklin (a consulting pathologist) alternated visits to the labs approximately every other

week (meaning one visit total every two weeks), for an undocumented number of hours per visit. Relators believe that this coverage was insufficient given the volume of testing performed at DaVita Labs.

126.   For example, New York requires that a part time medical director be on site for at least 20 hours per week, and requires that time on site be listed in the job description.

127.   DaVita's SOP notes that the CAP requires "a written agreement defining the frequency of, and responsibilities for, on-site visits," but this information is only outlined in Dr. Franklin's consulting contract with DaVita Labs.

128.   Additionally, DaVita's SOP states that the CLIA MD should review all method validations and Analytical Instrument Qualifications (AIQ), precision studies, accuracy studies, and stability studies.

129.   If someone besides the CLIA MD were to perform the function of review, it must be delegated in writing by the CLIA MD.

130.   Dr. Taylor could not find any such documentation of delegation from Dr. Pearl to Dr. Franklin, other than the information contained within the SOPs.

131.   Furthermore, no assessment of Dr. Franklin's competency had been completed to ensure he could perform reviews appropriately, even if they had been properly delegated.

132.   Next, Dr. Taylor also reviewed stability studies and method validations, including analytical instrument qualifications, and confirmed the suspicions of Dr. Holland: many method validations were absent, missing components, had been reviewed by someone other than the CLIA MD, or were outright missing or incomplete.

133.   Example issues noted by Dr. Taylor include:

- Incomplete validations of alternate tube types for urine chemistry and urinalysis

- Incomplete/absent validation of testing performed on plasma
- Incomplete/absent zinc method validation in DeLand prior to "re-validation" requested and reviewed by Dr. Holland
- Incomplete/absent validation of testing of therapeutic drugs in DeLand
- Eighteen instruments used in Chemistry, two instruments used in Hematology, and twenty-eight instruments used in Microbiology that had missing CLIA MD approvals

134.    Moreover, DaVita Labs performs several LDTs that lack sufficient data to support their validity, and that have not been reviewed and approved by any CLIA MD.

135.    For example, DaVita Labs performs testing on Peritoneal Dialysate and tests for trace elements in plasma, which meet the definition of an LDT.

136.    Dr. Taylor has not been able to locate precision, linearity, or accuracy for Peritoneal Dialysate.

137.    There was no record of validation studies for zinc prior to those that were approved by Dr. Holland.

138.    When asked, employees within the department could not remember the studies being performed.

139.    Forty-eight different tests which are billed outside the bundle are believed to have deficiencies in demonstrating specimen stability and/or method validation in one or both of DaVita's labs.

140.    When asked, teammates in the Fort Lauderdale Chemistry Department indicated that stability studies were not performed at that laboratory, and they relied on the stability studies from the DeLand laboratory.

141.    Even if the North lab has a proper method validation for a given test, the South lab must also have its own proper method validation documented for that same test.

**Retaliation Against Dr. Holland**

142.   After two years of seemingly endless battles of integrity versus profit, Dr. Holland felt

himself wearing down.

143.   He felt that he would be tempted to compromise his medical judgment just to avoid the

fight he knew was inevitable, and therefore was uncomfortable remaining in the role of CLIA

MD.

144.   On March 20, 2017, Dr. Holland resigned as CLIA MD, citing "undue pressure to

compromise [his] integrity" and "concerns about being allegedly responsible party for the billing

at DaVita Labs."

145.   After resigning as CLIA MD, Dr. Holland retained his role as Vice President of

Laboratories and Chief Laboratory Officer. However, DaVita quickly took steps to push him out

and to make him the scapegoat for the very same issues that he had previously identified.

146.   On April 24, 2017, Dr. Holland was issued a Written Warning:

> As the CLIA Medical Director for DaVita Labs and the Chief Laboratory
> Officer for DaVita, Inc., it was Dr. Holland's responsibility to ensure the
> accuracy of all clinical laboratory SOPs (relating to the operation of
> laboratory instrumentation and the tests performed by the laboratories
> under the CLIA Medical Director's supervision) and the alignment between
> said SOPs and the actual operations of the laboratories personnel. Between
> May 13, 2015 and December 5, 2016, Dr. Holland signed off on various
> revisions to three SOPs relating to the HCV RNA test. All three SOPs
> correctly called for the centrifugation of blood specimens within 24 hours
> of collection. The actual process followed in the DaVita North Lab (the
> only lab to perform the HCV RNA test), was to spin the specimen outside
> the 24 hour period as approved by the FDA and communicated to the
> laboratory by the instrumentation manufacturer. The undetected
> discrepancy resulted in the performance of tests outside the approved
> parameters for the test, namely specimen integrity. Upon review of the
> SOPs, it was reasonable and prudent to expect Dr. Holland to orient
> himself with the operation of the test and instrumentation to ensure
> alignment with the SOPs and to ensure the proper handling of the
> specimens.

147.    In other words, Dr. Holland received a written warning with threat of termination for not

ensuring adherence to the very same policy about which he had complained to management that

it had been ignoring—timely testing of samples.

148.    The Corrective Action Plan that was then issued required Dr. Holland to develop a

comprehensive SOP template, ensure SOPs would be redesigned to meet this format, and to

develop a training program and comprehensive monitoring plan in order to ensure adherence.

149.    Given the several hundred SOPs at DaVita Labs and the timeframe, this was an

impossible task.

150.    Dr. Holland immediately began working on the action items, but DaVita management

began pressuring him to resign, beginning with a call from CMO Allen Nissenson on April 25.

151.    Although DaVita never told him *why* he was expected to resign, David Van Wyck, Vice

President of Clinical Support Services, began having regular communication with Dr. Holland

about resigning, and on May 25, Van Wyck informed Holland that DaVita was considering that

date to be his resignation date and that his employment was terminated immediately. Still no

reason was given for the termination.

### Retaliation Against Dr. Taylor

152.    After taking over as CLIA MD, Dr. Taylor saw firsthand as Dr. Holland was ostracized

and ultimately pushed out of the company.

153.    On a May 26, 2017 phone call with Sharon Alpizar and David Van Wyck, Dr. Taylor

reiterated that she was unhappy with how Dr. Holland was being treated, and that she had serious

concerns about medical technologist competencies and clinician requests to change lab results.

154. On June 5, 2017, Dr. Taylor received another call from Sharon Alpizar and Dr. Van Wyck, in which she was told that she had 90 days to resign, and that QA and Safety were no longer her responsibility, effective immediately.

155. On June 7, Dr. Taylor emailed her resignation notice, effective September 4, 2017, to Dr. Van Wyck. Just as with Dr. Holland, DaVita then started a smear campaign against Dr. Taylor.

156. Dr. Taylor was issued a verbal warning nearly identical to the one given to Dr. Holland, along with a similarly unreasonable action plan that included due dates well past her resignation.

157. Moreover, from that point forward, every conversation she had with her supervisor, Jason Cline, was required to be witnessed and memorialized afterward via email.

158. On June 23 and June 26, Dr. Taylor met with Andrew Mohraz and discussed the concerns raised in her resignation letter.

159. She also had a call with Keith Carrington, in which she informed him that she was concerned about other method validations.

160. On June 16, 2017, after separate discussions with Dr. Van Wyck and Steve Cramer, Dr. Taylor sent an email to laboratory leadership stating that she had been unable to locate the method validation for Peritoneal Dialysate testing and recommended that the testing be sent to a reference laboratory.

161. On June 28, Dr. Taylor requested an update as to when and where the testing would be sent out. Jason Cline responded that he was unaware that the testing was still in house, and subsequently set up a meeting to discuss.

162. During the meeting that ensued, Dr. Taylor again indicated that the testing either needed to be sent out or patients rescheduled until such a time that the validation was complete.

-23-

163.    Dr. Taylor was then asked to discuss the rescheduling of patients and impact on patient care with Dr. Van Wyck and Dr. Marty Schreiber (office of CMO) in a follow up call.

164.    The call was held and concluded with Dr. Taylor expecting a follow-up, but about an hour later she was informed by email that DaVita would not be sending out any peritoneal dialysate fluids for testing.

165.    This exchange exemplifies the pushback that Dr. Holland and Dr. Taylor faced when attempting to make DaVita compliant.

166.    Even though it was technically Dr. Taylor's call as to whether the testing should happen at DaVita or be out-sourced, she was overruled.

167.    As it was now abundantly clear that Dr. Taylor would not be allowed to perform her job duties or ensure compliance, while DaVita was actively tarnishing her record for failures to ensure compliance, Dr. Taylor informed Dr. Van Wyck on June 30, 2017 that she was moving her resignation effective date up to July 19, 2017.

168.    On July 3, Dr. Van Wyck instructed Dr. Taylor to remain on call but not to come to the laboratory or attend any meetings.

## COUNT I
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
### (All Defendants)

169.    Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1 through 141.

170.    As set forth above, Defendants DaVita Healthcare Partners, Inc., DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc., individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous

false or fraudulent claims for payment or approval, in violation of the federal FCA, 31 U.S.C. § 3729(a)(1)(A).

171.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

172.   Relators are also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

**COUNT II**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**
**(All Defendants)**

173.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1 through 141.

174.   As set forth above, Defendants DaVita Healthcare Partners, Inc., DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc., individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the federal FCA, 31 U.S.C. § 3729(a)(1)(B).

175.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

176.   Relators are also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

**COUNT III**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)**
**(All Defendants)**

177.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1 through 141.

178.   As set forth above, Defendants DaVita Healthcare Partners, Inc., DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc., by and through their agents, officers, and employees, conspired to commit a violation of the federal FCA, 31 U.S.C. § 3729(a)(1)(C).

179.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

180.   Relators are also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

### COUNT IV
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)
### (All Defendants)

181.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1 through 141, and in particular those allegations concerning false and incomplete documentation found at Paragraphs 122 through 125.

182.   Defendants DaVita Healthcare Partners, Inc., DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc. knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

183.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

184.   Relators are also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

### COUNT V
### VIOLATION OF 31 U.S.C. § 3730—RETALIATION AGAINST RELATOR HOLLAND
### (Defendants Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc.)

185.    Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1 through 7, 12 through 13, and 15 through 151, and in particular those allegations found at Paragraphs 142 through 151.

186.    Defendants, Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc., violated Relator Holland's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance of an action under the federal FCA and other efforts to stop one or more violations alleged in this action.

187.    As a result of Defendants' actions, Relator has suffered damages in an amount to be shown at trial.

**COUNT VI**
**VIOLATION OF 31 U.S.C. § 3730—RETALIATION AGAINST RELATOR TAYLOR**
**(Defendants Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc.)**

188.    Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1 through 4, 8, 12 through 13, 15 through 141, and in particular those allegations found at Paragraphs 152 through 168.

189.    Defendants, Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc., violated Relator Holland's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against her for lawful acts done by her in furtherance of an action under the federal FCA and other efforts to stop one or more violations alleged in this action.

190.    As a result of Defendants' actions, Relator has suffered damages in an amount to be shown at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Relators Lorne Holland and Michelle Taylor pray for judgment against Defendant:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims and statements;

(c) awarding Relators thirty percent (30%) of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relators all relief available, including special damages, resulting from the retaliation pursuant to 31 U.S.C. § 3730(h);

(e) awarding Relators their litigation costs and reasonable attorneys' fees; and

(f) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby respectfully demand trial by jury on all issues and counts triable as of right before a jury.


Dated:   September 1, 2017                    Respectfully submitted,

                                              *Jill S. Schwartz, Esquire*
                                              Jill S. Schwartz, Esquire
                                              Florida Bar No. 523021
                                              Christopher A. Pace, Esquire
                                              Florida Bar No. 676721
                                              John M. Hunt, Esquire
                                              Florida Bar No. 91168
                                              **Jill S. Schwartz & Associates, P.A.**
                                              655 West Morse Boulevard, Suite 212
                                              Winter Park, Florida 32789-3745
                                              Telephone:  (407) 647-8911
                                              Facsimile:  (407) 628-4994
                                              jschwartz@schwartzlawfirm.net
                                              cpace@schwartzlawfirm.net
                                              jhunt@schwartzlawfirm.net

Julie Bracker, Esquire
Georgia Bar No. 073803
Jason Marcus, Esquire
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone:  (770) 988-5035
Facsimile:  (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com