**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* LORNE HOLLAND and | ) | |
| MICHELLE TAYLOR, | ) | |
| | ) | |
| Plaintiffs-Relators, | ) | Case No. 6:17-CV-01592-RBD-GJK |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| DAVITA, INC., f/k/a DAVITA | ) | |
| HEALTHCARE PARTNERS, INC.; | ) | |
| TOTAL RENAL LABORATORIES, INC.; | ) | |
| and DVA LABORATORY | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL[1]**

Relators Lorne Holland, M.D., and Michelle Taylor, D.O. ("Relators"), on behalf

of themselves and the United States of America ("United States" or the "Government"),

bring this action under 31 U.S.C. §§ 3729 *et seq.* (the "False Claims Act") to recover all

damages, penalties, and other remedies established by the False Claims Act on behalf of

the United States and themselves. Relators file their Second Amended Complaint and

Demand for Jury Trial against DaVita, Inc., f/k/a DaVita Healthcare Partners, Inc.; Total

Renal Laboratories, Inc.; and DVA Laboratory Services, Inc. (collectively "DaVita" or

"Defendants") and allege as follows:

---

[1] Relators file their Second Amended Complaint pursuant to the Court's January 2, 2020
Order (ECF No. 56).

## NATURE OF ACTION

1.      The proper performance of diagnostic laboratory tests is a matter of vital concern, affecting the public health, safety, and welfare of all citizens of the United States. Despite the critical and paramount importance of ensuring the integrity of specimens to be tested in its lab, DaVita knowingly made a financial, profit-driven decision based upon corporate tax incentives to operate its lab in Florida and to disregard its duty to ensure the accuracy of test results obtained from compromised specimens subjected to lengthy, bicoastal transport. DaVita also knowingly and intentionally ignored federally mandated quality control requirements that were established and are necessary to ensure the reliability of lab testing to properly diagnose and treat medically compromised patients. Consequently, and known to Defendants DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc., the dialysis services and treatment provided to DaVita's nationwide, vulnerable patient population were based upon and guided by lab results that were of dubious and unreliable accuracy. Despite this knowledge, Defendants agreed with each other to continue operating their laboratory testing services in a manner that did not and could not ensure the accuracy of the testing services billed to the Government. Defendants further agreed to use those lab results to provide a course of ongoing treatment for kidney dialysis patients, which Defendant DaVita, Inc. submitted as claims for payment to the Government, with knowledge that dialysis treatment premised on these unreliable results was neither reasonable nor necessary.

2.      This False Claims Act action is based on DaVita's fraudulent conduct described herein, which caused or resulted in the knowing submission of false claims to Medicare,

Medicaid, and other Government payors from at least June 2011 and continuing. The false

claims at issue request payment for lab services that DaVita knew did not and could not

provide accurate and reliable test results that were "reasonable and necessary for the

diagnosis and treatment of illness or injury or to improve the functioning of a malformed

body member," which is material to, and a precondition of, the Government's decision to

pay. 42 U.S.C. § 1395y(a)(1)(A).

3.      During the relevant time period, DaVita operated certified laboratories, which

were and remain subject to the Clinical Laboratory Improvements Amendments

("CLIA"), 42 U.S.C. § 263a. The Centers for Medicare and Medicaid Services ("CMS"),

a component of the U.S. Department of Health and Human Services, administers the

CLIA program. Pursuant to CLIA, CMS has promulgated regulations and standards

applicable to laboratory testing performed on human specimens for purposes of

diagnosis, treatment, prevention, or assessment of human health.

4.      In order to obtain its CLIA certificate allowing it to perform testing, DaVita was

required to certify and maintain compliance with CLIA requirements, including the CLIA

regulations found at 42 C.F.R. Part 493. The CLIA regulations set forth the standards and

conditions that all laboratory testing subject to CLIA must meet.

5.      Relators have insider knowledge of DaVita's fraudulent conduct and of the

specific allegations described herein and provide representative examples of actual false

claims submitted by DaVita to Medicare based on the following theories of False Claims

Act liability:

- Express False Certification: DaVita knowingly submitted or caused to be
  submitted false claims for reimbursement to the Government by expressly

and falsely certifying compliance with all of Medicare's rules and regulations; Medicaid's rules and regulations; statutory regulations promulgated by CLIA; and accrediting and state licensing regulations.

- <u>Implied False Certification</u>: DaVita also knowingly submitted or caused to be submitted false claims for reimbursement to the Government by making specific representations about the services provided and impliedly and falsely certifying compliance (or failing to disclose its noncompliance) with all of the above-mentioned relevant federal and state regulations, which authorize payment of claims by the Government.

- <u>Fraud in the Inducement</u>: DaVita knowingly submitted or caused to be submitted false claims for reimbursement to the Government by knowingly omitting and/or misrepresenting critical qualifying information (i.e., its inability to ensure accurate, reasonable, and necessary test results) and other material facts regarding its noncompliance with all of the above-mentioned relevant federal and state regulations in order to fraudulently obtain a CLIA certificate and/or induce the Government to enter into an enrollment contract and to pay money it otherwise would not have paid.

- <u>Reverse False Claims</u>: DaVita knowingly and fraudulently retained payments improperly received from Medicare, Medicaid, and other Government payors for the false claims described herein. DaVita was required to pay back such "overpayments," but knowingly did not do so.

6.      DaVita knew it was submitting or causing to be submitted false claims for reimbursement to Medicare, Medicaid, and other Government payors and did so to increase its revenue at the expense of the United States, in violation of the False Claims Act. This action seeks to stop DaVita from charging the Government for materially substandard, poor quality services that harm compromised patients and to recover those funds paid by the Government because of DaVita's fraud.

7.      The Government could not (and would not) have lawfully paid DaVita's false claims had it known of their violations of the Medicare, Medicaid, CLIA, and accrediting and state licensing regulations because such payment is statutorily prohibited. *See* 42

U.S.C. § 1395y. As a result, DaVita's violations were material to the Government's decisions to pay DaVita's false claims.

8.      DaVita wrongfully and unlawfully retaliated against Relators for opposing its fraudulent conduct.

## PARTIES

9.      Defendant DaVita, Inc., formerly known as DaVita Healthcare Partners, Inc.[2], is a leading provider of dialysis services in the United States, treating patients with chronic kidney failure and end stage renal disease ("ESRD"). Defendant DaVita, Inc. is incorporated under the laws of the State of Delaware, with its principal place of business located at 2000 16th Street, Denver, Colorado 80202. Defendant DaVita, Inc. may be served with process through its designated agent for service, Corporation Service Company, at 1900 West Littleton Boulevard, Littleton, Colorado 80120.

10.      As of December 2016, Defendant DaVita, Inc. provided dialysis and lab services for approximately 187,700 patients at 2,350 outpatient dialysis centers located in the District of Columbia and 46 states, including: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon,

---

[2] DaVita, Inc. changed its entity name to DaVita Healthcare Partners, Inc. in 2012, then changed its entity name back to DaVita, Inc. in 2016.

Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

11.     Defendant DaVita, Inc.'s ESRD lab services are provided by two separately licensed clinical laboratories owned by Defendant DaVita, Inc.: Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc.

12.     Defendants Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc., subsidiaries of Defendant DaVita, Inc., administer, process, and control all laboratory testing for DaVita, Inc.'s nationwide network of ESRD patients (except those located in Hawaii), which is an integral component of the overall dialysis services offered by Defendant DaVita, Inc.

13.     Defendant Total Renal Laboratories, Inc. is incorporated under the laws of the State of Florida, with its principal place of business located at 3000 DaVita Way, DeLand, Florida 32724. Defendant Total Renal Laboratories, Inc. may be served with process through its designated agent for service, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301-2525.

14.     Defendant DVA Laboratory Services, Inc. is incorporated under the laws of the State of Florida, with its principal place of business located at 3000 DaVita Way, DeLand, Florida 32724. Defendant DVA Laboratory Services, Inc. may be served with process through its designated agent for service, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301-2525.

15.     Defendants Total Renal Laboratories, Inc. and DVA Laboratory Services, Inc. are solely owned, managed, and controlled by and are alter egos of Defendant DaVita, Inc.

At all relevant times, Defendants DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc. have regularly conducted business throughout the United States, including by and through the "DaVita" trade name, and there is a sufficient unity of interest and ownership among and between each of them such that the acts of one are for the benefit of and can be imputed to the other. Defendants DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc. benefit financially from the policies, decisions, control, and management of their clinical laboratory operations in Florida and cannot avoid legal responsibility for actions taken at the facility and corporate levels, which Defendants DaVita, Inc., Total Renal Laboratories, Inc., and DVA Laboratory Services, Inc. directed and caused.

16.    Relator Lorne Holland, M.D., was hired by Defendant DaVita, Inc. in September 2014 to serve as the Chief Laboratory Officer for Defendant Total Renal Laboratories, Inc. and Defendant DVA Laboratory Services, Inc. In addition to his role as Chief Laboratory Officer, Relator Holland was also named Vice President of Operations in December 2014 and CLIA Medical Director in July 2015. Relator Holland resigned his position as CLIA Medical Director in March 2017 for the reasons described herein and was terminated as Chief Laboratory Officer and Vice President of Operations by DaVita in May 2017.

17.    Relator Michelle Taylor, D.O., was hired by Defendant DaVita, Inc. in January 2016 to serve as Interim Director for Special Projects overseeing Quality Assurance and Safety for Defendant Total Renal Laboratories, Inc. and Defendant DVA Laboratory Services, Inc. Upon Relator Holland's resignation as CLIA Medical Director in March

2017, Relator Taylor was named as DaVita's CLIA Medical Director. Relator Taylor was asked to resign her employment with DaVita in June 2017 for reasons similar to her predecessor's departure, and her resignation became effective in July 2017.

18.     In accordance with 31 U.S.C. § 3730(c)(3) and the Court's September 30, 2019 Order (ECF No. 23), Relators will serve the United States with a copy of their Second Amended Complaint contemporaneously upon filing.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Relators' claims. The United States district courts have exclusive jurisdiction over actions brought under the False Claims Act pursuant to 31 U.S.C. § 3732 and otherwise have jurisdiction over federal statutory causes of action under 28 U.S.C. §§ 1331 and 1345.

20.     At all times relevant to this Second Amended Complaint, Defendants conducted regular, substantial business throughout the United States, including the State of Florida. Accordingly, Defendants are properly subject to personal jurisdiction in the State of Florida generally, and this Court specifically.

21.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more Defendant(s) can be found, resides, or transacts business within this judicial district and the  acts proscribed by the False Claims Act and complained of herein took place in this District.

## FEDERALLY FUNDED HEALTHCARE PROGRAMS

22.     At all times relevant to this Second Amended Complaint, DaVita was enrolled in, and sought and received reimbursement from, Medicare, Medicaid, and other

Government-funded programs including, but not limited to, Federal Employees Health Benefits Program, CHAMPUS/TRICARE, and CHAMPVA.

**The Medicare Program**

23.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, which is administered through CMS.

24.     The Medicare Program is comprised of four parts: generally, Medicare Part A ("Hospital Insurance") provides insurance for the costs of hospitalization and post-hospitalization care; Medicare Part B ("Medical Insurance") provides insurance for physicians' services, outpatient care, medical supplies, and laboratory services, including facility dialysis treatments; Medicare Part C ("Medicare Advantage Plans") provides private insurance plans for Medicare Part A and Part B benefits; and Medicare Part D ("Prescription Drug Coverage") provides insurance for prescription drugs.

25.     Reimbursement for Medicare Part B claims is made by the United States through CMS, which contracts with fiscal intermediaries acting on its behalf to administer and pay Medicare Part B claims from the Medicare Trust Fund. *See* 42 U.S.C. § 1395(u); *see also*, 42 C.F.R. § 421.5(b). Separate payments are made for each Current Procedural Terminology ("CPT") code listed on Medicare Part B claims. In order to receive reimbursement from Medicare, the item or service must be "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

26.     Diagnostic laboratory tests are only covered and eligible for reimbursement under Medicare Part B if they are furnished by a laboratory that is in compliance with CLIA regulations. *See* 42 C.F.R. §§ 410.12 and 410.32(d)("Medicare Part B pays for covered diagnostic laboratory tests that are furnished by . . . a laboratory if it meets the applicable requirements for laboratories of part 493 in this chapter.").

27.     Before participating in the Medicare Program, providers such as DaVita are required to certify compliance with Medicare's rules and regulations. Thereafter, each time the provider submits a claim for payment, it is required to recertify its continued compliance.

28.     To participate in the Medicare program as a new enrollee, clinical laboratories such as DaVita must submit a Medicare Enrollment Application, Form CMS-855B, in order to bill or receive funds from Medicare. *See* CMS-855B, Medicare Enrollment Application for Clinics, Group Practices, and Certain Other Suppliers. These entities must also complete CMS Form 855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment. Enrolled providers of medical services to Medicare beneficiaries are eligible for government reimbursement for covered medical services and must agree to abide by the rules, regulations, policies, and procedures governing claims for payment in order to receive such reimbursement.

29.     The enrollment application "explains the penalties for deliberately falsifying information in [the] application to gain or maintain enrollment in the Medicare program." In addition to criminal penalties, the enrollment application informs provider applicants of the following:

The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who:

> a) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval;
>
> b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or
>
> c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

The Act imposes a civil penalty of $5,000 to $10,000[3] per violation, plus three times the amount of damages sustained by the Government.

* * *

Section 1128A(a)(1) of the Social Security Act imposes civil liability, in part, on any person (including an organization, agency or other entity) that knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency . . . a claim . . . that the Secretary determines is for a medical or other item or service that the person knows or should know:

> a) was not provided as claimed; and/or
>
> b) the claim is false or fraudulent.

This provision authorizes a civil monetary penalty of up to $10,000 for each item or service, an assessment of up to three times the amount claimed, and exclusion from participation in the Medicare program and State health care programs.

* * *

The government may assert common law claims such as "common law fraud," "money paid by mistake," and "unjust enrichment." Remedies

---

[3] The Bipartisan Budget Act of 2015 requires annual re-indexing of False Claims Act penalties for inflation. The new minimum penalty under the False Claims Act is currently $11,181, and the new maximum penalty is currently $22,363.

include compensatory and punitive damages, restitution, and recovery of the amount of the unjust profit.

CMS-855B, Medicare Enrollment Application for Clinics, Group Practices, and Certain Other Suppliers.

30.     As part of the enrollment application process, an authorized official with legal authority to enroll the provider in the Medicare Program and "to commit the organization to fully abide by the statutes, regulations, and program instructions of the Medicare program" must execute a Certification Statement, which "binds the [provider] to all of the requirements listed in the Certification Statement and acknowledges that the [provider] may be denied entry to or revoked from the Medicare program if any requirements are not met." *Id.*

31.     The enrollment application sets forth the following, *inter alia*, "additional requirements that the [provider] must meet and maintain in order to bill the Medicare [P]rogram" and which the provider must certify and attest to having read and understood:

> I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.
>
> * * *
>
> I agree to abide by the Medicare laws, regulations and program instructions that apply to this [provider]. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable

conditions of participation in Medicare. I agree that any existing or future overpayment made to the [provider] by the Medicare program may be recouped by Medicare through the withholding of future payments.

\* \* \*

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.*

32.     After its initial certification, a provider has an ongoing duty to "immediately"

notify Medicare "if any information furnished on the application is not true, correct, or

complete":

[A]n authorized official, by his/her signature, agrees to notify the Medicare fee-for-service contractor of any future changes to the information contained in this form, after the [provider] is enrolled in Medicare, in accordance with the timeframes established in 42 C.F.R. 424.516.

*Id.*

33.     In addition to the initial and ongoing certifications, each time a provider submits a

claim, electronically or otherwise, the submission must state, in boldface type,

immediately preceding the provider's signature:

(1)     "This is to certify that the foregoing information is true, accurate, and complete."

(2)     "I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."

42 C.F.R. § 455.18(a).

34.     For each individual claim for payment, providers such as DaVita must submit a

CMS Form 1500 (or its electronic equivalent, known as the 837P format), which requires

the provider to certify that:

> 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions . . . ; 3) I have provided or will provide sufficient information required to allow the [G]overnment to make an informed eligibility and payment decision; 4) this claim . . . complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment . . . ; [and] 5) the services on this form were medically necessary . . . .

CMS-1500; *see* 42 C.F.R. § 424.32.

35.     CMS Form 1500 also requires the provider to certify its understanding "that payment and satisfaction of [the] claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." *Id.*

36.     A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

37.     Because it is not feasible for the Medicare Program, or its contractors, to review medical records corresponding to each of the millions of claims for payment it receives from providers, the Program relies on providers to comply with Medicare requirements and relies on providers to submit truthful and accurate certifications and claims.

38.     Generally, once a provider submits a CMS Form 1500, or the electronic equivalent, to Medicare, the claim is paid directly to the provider, in reliance on the foregoing certifications, without any review of supporting documentation, including medical records.

-14-

## The Medicaid Program

39.     The Medicaid Program was created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to aid participating states in providing medical services to the financially needy, aged, blind, or disabled, and families with dependent children. *See* 42 U.S.C. §§ 1396-96w. Medicaid is funded by both federal and state governments, with the federal contribution computed separately for each state. *See* 42 U.S.C. §§ 1396b, 1396d(b).

40.     Medicaid serves as the nation's primary source of health insurance coverage for low-income populations, providing coverage to over sixty-five million people. All states, the District of Columbia, and the U.S. territories have Medicaid programs.

41.     Medicaid is administered by CMS at the federal level and by state agencies in each of the 50 participating states at the state level. The states establish eligibility standards, the scope and types of services covered, and the rate of payment.

42.     The federal government pays a share of each state's Medicaid expenditures. The federal medical assistance percentage ("FMAP") calculation determines the amount of federal reimbursement for each state's Medicaid expenditures. FMAP is calculated using the per capita income amounts of the state relative to total U.S. per capita income.

43.     The FMAP formula is designed so that the federal government pays a larger portion of Medicaid costs in states with lower per capita incomes relative to the national average.

44.     At all times relevant to this Second Amended Complaint, the United States provided funds to the states through the Medicaid Program pursuant to Title XIX of the

Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid beneficiaries are required to abide by the rules, regulations, policies, and procedures governing claims for payment under the provisions of Title XIX of the Social Security Act.

45.     Medicaid programs require enrolled providers, such as DaVita, to certify compliance with all federal and state statutes and regulations in order to receive payment from Medicaid.

## CLINICAL LABORATORY IMPROVEMENT AMENDMENTS REGULATIONS

46.     CMS regulates the conditions that all laboratories must meet to be certified to perform testing on human specimens through CLIA, which established quality standards for all laboratory testing to ensure the accuracy, reliability, and timeliness of patient test results regardless of where the test was performed.

47.     CLIA's laboratory regulations, codified at 42 C.F.R. § 493, apply to all "laboratories seeking payment under the Medicare and Medicaid [P]rograms," and the "requirements are the same for Medicare approval as for CLIA certification." 42 C.F.R. § 493.

48.     Compliance with CLIA's laboratory regulations is material to the government's decision to pay Medicare claims.  CLIA regulations expressly state that Medicare Part B will only reimburse for diagnostic laboratory tests furnished by a laboratory that is in compliance with CLIA regulations. *See* 42 C.F.R. §§ 410.12 and 410.32(d).

49.     Medicaid programs contain similar requirements. For example, the Georgia Medicaid Manual expressly states that services "for which the performing provider does

not have appropriate CLIA certification" are "non-covered." Georgia Medicaid Manual, Part II, Policies and Procedures for Independent Laboratory Services, Section 904(l). In the reimbursement section, the Manual also makes clear: "If a provider bills for a procedure without appropriate CLIA certification, reimbursement will be denied." *Id.* at Section 1003.

50.     Unless otherwise exempt, each laboratory seeking federally-funded reimbursement must possess a CLIA certificate. *See* 42 C.F.R. §§ 493.3, 493.5.

51.     CLIA requirements vary according to the technical complexity in the testing process and risk of harm in reporting erroneous results. The regulations establish three categories of testing based upon the complexity of the testing methodology: waived tests, tests of moderate complexity, and tests of high complexity. Laboratories performing moderate and/or high complexity testing must meet requirements for proficiency testing, patient test management, quality control, quality assurance, and personnel. *See* 42 C.F.R. §§ 493.5, 493.17.

52.     CLIA requires each laboratory seeking federally-funded reimbursement to be "in compliance with applicable [f]ederal, [s]tate, and local laboratory requirements." 42 C.F.R. § 493.1101(c).

53.     CLIA requires each laboratory seeking federally-funded reimbursement to "establish and follow written policies and procedures that ensure . . . *optimum integrity* of a patient's specimen from the time of collection or receipt of the specimen through completion of testing and reporting of results." 42 C.F.R. § 493.1232 (emphasis added).

54.     CLIA requires each laboratory seeking federally-funded reimbursement to "establish and follow written policies and procedures for each of the following," *inter alia*:

    1.     Specimen collection;

    2.     Specimen storage and preservation;

    3.     Conditions for specimen transportation;

    4.     Specimen processing; and

    5.     Specimen acceptability and rejection.

42 C.F.R. § 493.1242. "The laboratory must document the date and time it receives a specimen." *Id.*

55.     CLIA requires each laboratory seeking federally-funded reimbursement to follow a written procedure manual, provided by a manufacturer's test system instructions or by the lab in the absence of a manufacturer's test system instructions, for all tests performed by the laboratory, which must include, *inter alia*:

    1.     Requirements for specimen collection, storage, preservation, transportation, and processing;

    2.     Calibration and calibration verification procedures;

    3.     The reportable range for test results for the test system as established or verified in § 493.1253;

    4.     Control procedures;

    5.     Corrective action to take when calibration or control results fail to meet the laboratory's criteria for acceptability; and

    6.     Limitations in the test methodology, including interfering substances.

-18-

*See* 42 C.F.R. § 493.1251. "Procedures and changes in procedures must be approved, signed, and dated by the current laboratory director before use." *Id.*

56.     CLIA requires each laboratory seeking federally-funded reimbursement to perform tests "following the manufacturer's instructions and in a manner that provides test results within the laboratory's stated performance specifications for each test system." 42 C.F.R. § 493.1252.

57.     CLIA requires each laboratory seeking federally-funded reimbursement to "define criteria for those conditions that are essential for *proper storage* of reagents and *specimens* [and] accurate and reliable test system operation." *Id.* (emphasis added).

58.     CLIA requires each laboratory seeking federally-funded reimbursement to not use reagents, solutions, and other supplies "when they have exceeded their expiration date, have deteriorated, or are of substandard quality." *Id.*

59.     CLIA requires each laboratory seeking federally-funded reimbursement "that introduces an unmodified, FDA-cleared or approved test system" to "do the following *before reporting patient test results*":

> (i) Demonstrate that it can obtain performance specifications comparable to those established by the manufacturer for the following performance characteristics:
>
>> (A) Accuracy.
>>
>> (B) Precision.
>>
>> (C) Reportable range of test results for the test system.
>
> (ii) Verify that the manufacturer's reference intervals (normal values) are appropriate for the laboratory's patient population.

42 C.F.R. § 493.1253 (emphasis added). "The laboratory must document all activities specified in this section." *Id.*

60.    CLIA requires each laboratory seeking federally-funded reimbursement "that modifies an FDA-cleared or approved test system, or introduces a test system not subject to FDA clearance or approval . . ., or uses a test system in which performance specifications are not provided by the manufacturer" to, "*before reporting patient test results*, establish for each test system the performance specifications for the following performance characteristics":

(i) Accuracy.

(ii) Precision.

(iii) Analytical sensitivity.

(iv) Analytical specificity to include interfering substances.

(v) Reportable range of test results for the test system.

(vi) Reference intervals (normal values).

(vii) Any other performance characteristic required for test performance.

42 C.F.R. § 493.1253 (emphasis added). "The laboratory must document all activities specified in this section." *Id.*

61.    CLIA requires each laboratory seeking federally-funded reimbursement to "document all corrective actions taken when the criteria for proper storage of reagents and specimens, as specified under § 493.1252(b), are not met." 42 C.F.R. § 493.1282.

62.    CLIA's regulatory provisions and requirements have a direct impact on a laboratory's overall test performance, reliability, and accuracy.

63.     CMS may suspend, limit, or revoke a laboratory's CLIA certificate and cancel a laboratory's approval to receive Medicare payment for its services if the laboratory is out of compliance with the statutory requirements of CLIA. *See* 42 C.F.R. §§ 493.1800-1850.

64.     CMS may suspend all or part of any Government payments to which a clinical laboratory would otherwise be entitled if the laboratory is out of compliance with the statutory requirements of CLIA. *See* 42 U.S.C. § 1395w-2(b)(2)(A)(iv).

65.     CMS' authority to sanction laboratories that are not in compliance with the statutory requirements of CLIA is "in addition to sanctions otherwise available under [s]tate or [f]ederal law." 42 U.S.C. § 1395w-2(b)(2)(B).

66.     Thus, compliance with the requirements of CLIA is material to the Government's decision to pay a claim for services rendered by an enrolled laboratory and is a precondition to receiving reimbursement from Medicare, Medicaid, and all other Government payors.

## NEW YORK STATE DEPARTMENT OF HEALTH
## CLINICAL LABORATORY STANDARDS OF PRACTICE

67.     On August 28, 1995, the Health Care Finance Administration ("HCFA") granted an exemption from the CLIA regulations to all laboratories located in the state of New York possessing a valid New York State permit to perform laboratory testing because the New York Clinical Laboratory Evaluation Program (Public Health Law Article 5, Title V) and its regulations (10 N.Y.C.R.R. 19, 58, 63, and 7190) met or exceeded the federal CLIA regulations.

68.     Because a clinical laboratory must meet CLIA requirements in order to receive reimbursement from Medicare, Medicaid, and other Government payors, New York

State's exempt status with HCFA allows clinical laboratories located within New York to meet CLIA requirements by holding a New York State clinical laboratory permit. As New York is one of the states with a federally-approved licensure program, a laboratory may obtain a state license in lieu of a federal CLIA certificate.[4]

69.     On par with CLIA's requirements, the New York State Department of Health clinical laboratory standards ("NYSDOH Standards") require laboratories to establish the analytic and clinical performance characteristics of all tests performed. If such characteristics have been defined by the test manufacturer and approved by the FDA, NYSDOH Standards require the laboratory to verify those characteristics at the site where the test will be performed.

70.     As with CLIA, NYSDOH Standards also require each lab performing modified FDA-approved tests to establish performance specifications for accuracy, precision, analytical sensitivity and specificity, reportable range of results, reference intervals, and other applicable performance characteristics *and to first seek explicit approval before patient testing may commence*.

## THE FEDERAL FALSE CLAIMS ACT

---

[4] CLIA has exempted only two states, Washington and New York, which have established lab quality standards that equal or exceed CLIA program requirements. In those states, a lab may obtain a state license pursuant to a federally approved licensure program in lieu of a CLIA certificate. All references throughout this Second Amended Complaint to the standards required by CLIA or a CMS-approved accrediting agency apply equally to the standards required by the state licensing regulations for labs in Washington and New York. In addition, all references throughout this Second Amended Complaint regarding DaVita's interaction with CLIA or a CMS-approved accrediting agency apply equally to DaVita' interaction with the state licensing agencies for labs in Washington and New York.

71.     The False Claims Act imposes liability upon any person who: "knowingly

presents, or causes to be presented [to the Government], a false or fraudulent claim for

payment or approval"; or "knowingly makes, uses, or causes to be made or used, a false

record or statement material to a false or fraudulent claim"; or "knowingly makes, uses,

or causes to be made or used, a false record or statement material to an obligation to pay

or transmit money . . . to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the

Government." 31 U.S.C. §§ 3729(a)(1)(A), (B), (G).

72.     Any person found to have violated the False Claims Act is liable for a civil

penalty of at least $11,181 and up to $22,363 for each such false or fraudulent claim, plus

three times the amount of the damages sustained by the Government. *See* 31 U.S.C. §

3729(a)(1); 28 C.F.R. § 85.5 (2018). A person who submits a false claim for payment is

liable under the False Claims Act for statutory penalties even if the Government did not

incur actual damages or suffer any loss. *See, e.g., Lamb Eng'g & Constr. Co. v. United

States*, 58 Fed. Cl. 106, 111 (2003).

73.     Generally, a violation of the False Claims Act occurs when there has been: (1) a

false statement or fraudulent course of conduct; (2) made or carried out with knowledge

of the falsity; (3) that was material; and (4) that involved a claim.

74.     Falsity occurs when a person misrepresents the goods or services provided to the

Government or when a person falsely certifies, expressly or impliedly, compliance (or

fails to disclose noncompliance) with material statutory, regulatory, or contractual

requirements.

75.     Falsity may be a premise of liability where a person requesting payment "makes

certain representations which are misleading because of the omission of violations of

statutory, regulatory, or contractual requirements," regardless of whether the

requirements were an express condition of payment, and the omission was

material. *Marsteller for the use and Benefit of United States v. Tilton*, 880 F.3d 1302,

1313 (11th Cir. 2018).

76.     The False Claims Act defines "knowingly" as having "actual knowledge of the

information" or merely acting "in deliberate ignorance" or "in reckless disregard" of the

truth or falsity of the information. 31 U.S.C. § 3729(b)(1). Significantly, "no proof of

specific intent to defraud is required" under the False Claims Act. *Id.*

77.     The False Claims Act defines "material" as "having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. §

3729(b)(4).

78.     The False Claims Act broadly defines a "claim" as:

> any request or demand, whether under a contract or otherwise, for money .
> . . that is presented to . . . an agent of the United States; or is made to a
> contractor, grantee, or other recipient, if the money . . . is to be spent or
> used on the Government's behalf or to advance a Government program or
> interest, and if the United States Government provides or has provided any
> portion of the money . . . requested or demanded; or will reimburse such
> contractor, grantee, or other recipient for any portion of the money . . .
> which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2).

79.     False or fraudulent bills or other requests for payment or reimbursement from

Government Programs have routinely been found to constitute "claims" giving rise to

liability under the False Claims Act. *See, e.g.*, *Universal Health Servs. v. United States ex*

*rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

80.     The Supreme Court of the United States has recognized that Congress intended that the False Claims Act be broadly applied to protect government funds and property from fraudulent claims. *See, e.g.*, *United States v. Niefert-White Company,* 390 U.S. 228, 232-33 (1968).

81.     The False Claims Act empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. *See* 31 U.S.C. § 3730. The False Claims Act also contains anti-retaliation provisions, which prohibit an employer from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations." 31 U.S.C. § 3730(h)(1). The relief available to an employee under this provision is two times the amount of back pay plus interest, reinstatement with the same seniority status, and compensation for any special damages, including litigation costs. *See* 31 U.S.C. § 3730(h)(2).

## THE STATE FALSE CLAIMS ACTS

82.     Currently, 31 states have their own state False Claims Acts, which are modeled on the federal False Claims Act, 31, U.S.C. §§ 3729-33 (e.g., California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; Colorado Medicaid False Claims Act,  Colo. Rev. Stat. §§ 25.4-4-303.4 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. Ann. §§ 17b-30a1 *et seq.*; Delaware False Claims and Reporting Act, 6 Del. Code Ann. §§ 1201 *et seq.*; District of Columbia False Claims Act, D.C. Code §§ 2-381.01 *et seq.*; Florida False

Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq.*; Georgia False Medicaid Claims Act,

O.C.G.A. §§ 49-4-168 *et seq.*; Hawaii False Claims Act for False Claims to the State,

Haw. Rev. Stat. §§ 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/3 *et seq.*;

Indiana False Claims and Whistleblower Protection Law, Ind. Code §§ 5-11-5.5-1 *et seq.*;

Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; Louisiana Medical Assistance

Programs Integrity Law, La. Rev. Stat. Ann. §§ 6:438.1 *et seq.*; Maryland False Claims

Act, Md. Code, Health-Gen. §§ 2-601 *et seq.*; Massachusetts False Claims Act, Mass.

Gen. Laws Ch. 12 §§ 5A *et seq.*; Michigan Medicaid False Claim Act, MCL 400.600, *et

seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.02; Montana False Claims Act,

Mont. Code Ann. §§ 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. §§

357.010 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §§ 167:61-b *et

seq.*; New Jersey False Claims Act, N.J.S.A. §§ 2A:32C- l *et seq.*; New Mexico Medicaid

False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; New York False Claims Act, State

Fin. Law §§ 187 *et seq.*; North Carolina False Claims Act, N.C.G.S.A. §§ 1-605 *et seq.*;

Oklahoma Medicaid False Claims Act, Okla. Stat. 63 §§ 5053 *et seq.*; Rhode Island False

Claims Act, R.I. Gen. Laws Ann. §§ 9-1.1-1 *et seq.*; Tennessee False Claims Act, T.C.A.

§§ 4-18-101 *et seq.*; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann.

§§ 36.001 *et seq.*; Vermont False Claims Act, 32 V.S.A. §§ 630 *et seq.*; Virginia Fraud

Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.12 *et seq.*; Washington State

Medicaid Fraud False Claims Act, RCW 74.66.005 *et seq.*; and Wisconsin False Claims

For Medical Assistance Law, Wis. Stat. § 20.931 *et seq.*).

83.     The core provisions of the New York False Claims Act are typical of these state

False Claims Acts. The New York False Claims Act provides that any person who:

> a) knowingly presents, or causes to be presented a false or fraudulent
> claim for payment or approval;
>
> b) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to a false or fraudulent claim; [or]
>
> c) conspires to commit a violation of [paragraphs (a) or (b)] of this
> subdivision;
>
> \* \* \*
>
> shall be liable to the state or a local government, as applicable, for a civil
> penalty of not less than six thousand dollars and not more than twelve
> thousand dollars, plus three times the amount of all damages, including
> consequential damages, which the state or local government sustains
> because of the act of that person.

N.Y. State Fin. Law § 189(1).

84.     The New York False Claims Act defines "knowing and knowingly" as having

"actual knowledge of the information" or merely acting "in deliberate ignorance" or "in

reckless disregard" of the truth or falsity of the information. N.Y. State Fin. Law §

188(3).

85.     The New York False Claims Act broadly defines a "claim" as:

> any request or demand, whether under a contract or otherwise, for money
> or property that . . . is presented to an officer, employee or agent of the
> state or a local government; or . . . is made to a contractor, grantee, or
> other recipient, if the money or property is to be spent or used on the state
> or a local government's behalf or to advance a state or local government
> program or interest, and if the state or local government (A) provides or
> has provided any portion of the money or property requested or
> demanded; or (B) will reimburse such contractor, grantee, or other
> recipient for any portion of the money or property which is requested or
> demanded.

N.Y. State Fin. Law § 188(1).

## RELEVANT FACTUAL ALLEGATIONS

### Background

86.     Over 500,000 Americans suffer from ESRD, or Stage 5 Chronic Kidney Disease, which requires dialysis treatment or a kidney transplant in order to survive. A typical ESRD patient undergoes dialysis treatments three times each week, and each treatment lasts approximately four (4) hours. Most ESRD patients are very sick and vulnerable.

87.     Dialysis treatment for ESRD patients involves the use of a machine to filter waste and excess water from a patient's blood, attempting to replace many important functions of the patient's kidney.

88.     Lab testing on ESRD patients involves different tests based on the patient's particular stage of kidney disease and is effective in measuring kidney function, determining appropriate treatment options or changes in treatment plans, monitoring progression of the disease, and identifying additional health concerns or medical conditions.

89.     Medicare pays for claims associated with ESRD treatment, including dialysis and associated lab work, for individuals who qualify for Social Security benefits and also for spouses and dependent children of individuals who meet certain eligibility requirements. Medicaid provides ESRD benefits for those beneficiaries who do not qualify for Medicare ESRD coverage.

90.     If an ESRD patient has health insurance other than Medicare, Medicare will act as a secondary payor during the first thirty months of ESRD treatment; thereafter, Medicare will become the ESRD patient's primary payor for ESRD treatment. During those first

thirty months, the health insurer for an ESRD patient, which may be another federal health insurance program such as the Federal Employees Health Benefit Program[5], CHAMPUS/TRICARE[6], CHAMPVA[7], and Medicare Part C Advantage Plans, pays for claims associated with his or her ESRD treatment.

91.     CMS administers the ESRD Quality Incentive Program ("QIP") to promote high-quality services in outpatient dialysis facilities treating patients with ESRD. The ESRD QIP will reduce payments to ESRD facilities that do not meet or exceed certain performance standards, which include an evaluation of laboratory data. The maximum payment reduction CMS can apply to any facility is two percent.

92.     Commercial lab tests (also known as "assays") are those that are performed using commercially manufactured kits and equipment. Unlike tests developed for use in a single laboratory or laboratory company (known as lab-developed tests or "LDTs"), commercial lab tests are manufactured, marketed, and sold in volume as kits to multiple labs and other healthcare facilities.

93.     The development and marketing of commercial lab tests are regulated by the U.S. Food and Drug Administration ("FDA"). Because commercial lab tests are considered "medical devices" (and, specifically, "*in vitro* diagnostic devices"), they must be evaluated and approved by the FDA. The FDA-approval process may be years-long and involves many phases – research, testing, clinical evaluation, development of

---

[5] The Federal Employees Health Benefit Program provides health insurance for federal employees, retirees, and the survivors of such individuals.
[6] CHAMPUS/TRICARE provides health insurance to individuals and dependents affiliated with the armed forces.
[7] CHAMPVA provides health insurance to families of disabled veterans.

manufacturing processes, and review by regulatory authorities.

94.    As part of the FDA-approval process, manufacturers of commercial lab tests must clearly state the collection, processing, and storage conditions necessary for acceptable performance of the assay. These requirements are incorporated into the FDA package insert instructions, which accompany the sale of the assay and prescribe its proper use.

95.    Package insert instructions are based on large-scale reliability studies that are scrutinized by the FDA as part of the assay approval process and represent the specific conditions under which the commercial lab test will produce accurate results.

*96.*    A laboratory is required to verify performance specifications for instruments (new, borrowed, modified, and relocated) and methods (any test system implemented after April 24, 2003 and each specimen type) before use. *See* 42 CFR § 493.1253(a).

97.    For each commercial lab test performed in accordance with the manufacturer's FDA-approved package insert instructions, a lab must first test and verify that it can obtain performance specifications (for accuracy, precision, and reportable range) that are comparable to those established by the manufacturer, *prior to reporting patient test results*. *See* 42 C.F.R. § 493.1253(b)(1) (emphasis added).

98.    Instrument and method validations for a lab performing a test in accordance with the manufacturer's FDA-approved package insert instructions also require the lab to verify that the manufacturer's reference intervals (normal values) are appropriate for the demographic characteristics of the lab's patient population. *See id.*

99.     For each commercial lab test performed in a manner that deviates in any way from the manufacturer's FDA-approved package insert instructions[8] (e.g., uses a different specimen; changes tube types; changes times, temperatures, or dilutions; changes or deletes steps; tests specimens stored beyond manufacturer-defined stability conditions), a lab must validate the instrument and method through a more rigorous series of processes that test and verify that the modified performance specifications still produce accurate results. *See* 42 C.F.R. § 493.1253(b)(2).

100.    With respect to LDTs or modified FDA-approved tests (tests that deviate in any way from the manufacturer's FDA-approved package insert instructions), the CLIA regulations require that the laboratory establish performance specifications for accuracy, precision, analytical sensitivity, analytical specificity, reportable range, reference intervals (normal range), and other important performance characteristics. *See* 42 C.F.R. § 493.1253. This process is commonly referred to as "method validation." The CLIA regulations define "reference range" as "the range of test values expected for a designated population of individuals, e.g. 95 percent of individuals that are presumed to be healthy (or normal)." 42 C.F.R. § 493.2.

101.    The CLIA regulations also require that a laboratory establish and implement adequate controls and standard processes to ensure that calculations are performed within the performance specifications established by the lab and test results are transmitted accurately from the point of data collection to the test report provided to the patient's

---

[8] LDTs developed by laboratories for their own use and test systems with performance specifications not provided by the manufacturer are also included in this category.

practitioner. *See* 42 C.F.R. §§ 493.1252(a), 493.1256, 493.1291.

102.    Instrument and method validations for all lab tests must be performed, and the results approved, signed, and dated by the lab's CLIA medical director, *before reporting (and billing Government payors for) patient test results*. *See* 42 C.F.R. §§ 493.1253(b)(1), (2).

103.    Instrument and method validations are critical for ensuring that the amount of error present in the system will not affect the interpretation of the test result. Failure to properly perform the required instrument and method validations could compromise patient care.

**False Statements and Fraudulent Conduct Involving Claims to Government Payors**

104.    At all times relevant to this Second Amended Complaint, DaVita possessed a CLIA certificate of accreditation and was accredited by the College of American Pathologists ("CAP"), a CLIA-approved accrediting agency. *See* 42 C.F.R. §§ 493.5, 493.551.

105.    Until December 2018, DaVita operated two independent, high complexity laboratories in Florida – Total Renal Laboratories, Inc. in DeLand (referred to as the "North" lab) and DVA Laboratory Services, Inc. in Ft. Lauderdale (referred to as the "South" lab). In December 2018, DaVita opened a new lab in DeLand, which retained the legal business name of Total Renal Laboratories, Inc., and ceased operations in its North and South labs.

106.    As confirmed by a Medicare Administrative Contractor on May 3, 2018, to Jason Cline, DaVita's Vice President and General Manager, Total Renal Laboratories, Inc.

became enrolled in the Medicare Program, certifying that it would abide by the rules, regulations, policies, and procedures governing claims for payment in order to receive reimbursement, on October 1, 1992.

107.    As also confirmed by a Medicare Administrative Contractor on May 3, 2018, to Mr. Cline, DVA Laboratory Services, Inc. became enrolled in the Medicare Program, certifying that it would abide by the rules, regulations, policies, and procedures governing claims for payment in order to receive reimbursement, on November 9, 1984.

108.    DaVita's lab operations specialize in providing ESRD patient testing, which monitors a patient's ESRD condition regarding critical outcome indicators, including the adequacy of dialysis as well as other medical conditions of the patient, and is an integral component of DaVita's overall dialysis services.

## I.    Failure to Validate Deviations from FDA-Approved Instructions

109.    DaVita knew and understood that it was required to perform method validation for all procedures and aspects of testing and was required to validate and scientifically establish all reference ranges it listed on a test report.

110.    DaVita also knew and understood that CLIA regulations required that it conduct method validation with respect to all aspects of each LDT or modified FDA-approved test and each step performed in the testing, calculation, and reporting of test results.

### (Specimen Stability)

111.    DaVita processes all lab test samples from patients across the continental United States in its lab located in Florida, which requires specimens to undergo lengthy transport over long distances and exposes them to poorly controlled environmental conditions.

112.    Specimen stability is "the capability of a sample material to retain the initial property of a measured constituent *for a period of time* within specified limits when the sample is stored *under defined conditions*." International Standards Organization Guide 30 (1992) (emphasis added). Instability is present when there are changes in one or more of those measurements. A specimen that is not maintained within defined conditions can deteriorate and become unstable at a molecular level and will not represent the condition of the patient whose specimen was collected.  If that occurs, the patient's results will be invalid, jeopardizing the patient's safety.

113.    As part of the FDA-approval process, manufacturers of commercial lab tests indicate, and include in their package insert instructions, the *specific* storage conditions required to maintain specimen stability in order to produce accurate test results.

114.    As affirmed by multiple regulations in CLIA discussed herein, specimen transport and storage conditions, together with the time interval between collection and testing, can have critical effects on the quality of test results and, resultantly, patient care.

115.    DaVita does not maintain or follow a written policy or procedure to track, by time and/or temperature, a patient's specimen from the time of collection through completion of testing and, therefore, cannot and does not ensure optimum integrity of the patient's specimen or compliance with the manufacturer's package insert storage instructions. *See* 42 C.F.R. § 493.1232.

116.    In fact, DaVita does not maintain or follow a written policy or procedure that requires specimens to be segregated in accordance with FDA-approved storage conditions (i.e., temperature requirements); rather, specimens requiring refrigeration to

ensure stability arrive in the same box as specimens requiring room temperature to ensure stability, along with other specimens that are required to be frozen to ensure stability.

117.    When specimens arrive in boxes at DaVita's lab located in Florida, they are unpacked en masse and remain at room temperature to be sorted and processed (a process known as "accessioning") without regard for maintaining specimen stability in accordance with the manufacturer's package insert instructions or otherwise.

118.    Without regard for evaluating specimen stability, DaVita does not document the date and time a specimen arrives at the lab. *See* 42 C.F.R. § 493.1242.

119.    At accessioning, DaVita's proprietary computer program is programmed to round the age of the specimen to the nearest full day. For example, if two specimens are accessioned at 24 and 35 hours after collection, respectively, both would be rounded to a specimen age of one day and recorded as if tested the day after collection. In this example, if the manufacturer's specific conditions for stability require the specimen to be tested within one day (or 24 hours) after collection, DaVita would determine both tests suitable for testing, even though the second sample is more than one day (or 24 hours) old. Because of this process, specimens that are no longer stable and are beyond the manufacturer's defined storage time at accessioning are nonetheless accepted by DaVita's computer program for testing.

120.    After accessioning, DaVita transports its specimens to another department to be loaded onto instruments for testing. Specimens remain at room temperature for another lengthy and variable amount of time awaiting testing.

121.    Without regard for evaluating specimen stability, DaVita does not record or utilize the date and time a specimen is tested, which is provided on the testing instrument, to reject specimens that are no longer stable.

122.    Altogether, specimens remain at room temperature at DaVita's labs for a period of time ranging from 14 to 40 hours before they are tested.

123.    After testing, specimens remain at room temperature for another lengthy and variable amount of time until all testing is completed for the day, despite the fact that specimens may require repeat testing, additional testing, or testing in another department.

124.    As a result of DaVita's processes, specimens that are no longer stable, according to the FDA-approved package insert instructions, are tested and billed to Government payors and are used by physicians to determine appropriate treatment options or changes in treatment plans, including supplementing or altering patients' medications.

125.    For example, the manufacturer's FDA-approved package insert instructions for testing Vancomycin (antibiotic) level (CPT 80202) require specimens to consist of the liquid portion of blood (i.e., serum or plasma), which must be separated at collection from the cellular elements (i.e., red blood cells, white blood cells, and platelets) of a blood specimen, and to be stored frozen at -20°C to avoid specimen degradation and to ensure accurate test results.

126.    Throughout Relators' entire employment, DaVita routinely tested (and billed for) Vancomycin (antibiotic) level (CPT 80202) outside of the manufacturer's FDA-approved requirement that the specimen be stored frozen at -20°C to prevent erroneous test results.

127.    DaVita does not have or follow a Standard Operating Procedure requiring the maintenance of frozen temperatures for any patient specimen during shipping.

128.    DaVita does not require or ensure that specimens tested for Vancomycin (antibiotic) level (CPT 80202) be frozen at -20°C upon receipt at its lab.

129.    While outside of the manufacturer's FDA-approved package insert instructions, DaVita neither performed nor documented any method validation with regard to its modified process for testing Vancomycin (antibiotic) level (CPT 80202) *before reporting (and billing Government payors for) patient test results*, which is required by CLIA and is material to, and a precondition of, payment by Medicare, Medicaid, and all other Government payors. *See* 42 C.F.R. § 493.1253.

130.    Specifically, as an actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient BB on January 6, 2016, under CPT 80202 (Vancomycin (antibiotic) level). DaVita billed Medicare in the amount of $183.33 on this claim, and Medicare paid $18.09 on January 3, 2017.

131.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on November 28, 2016, for lab services provided to Patient II on October 20, 2016, under CPT 80202 (Vancomycin (antibiotic) level). DaVita billed Medicare in the amount of $183.33 on this claim, and Medicare paid $1.09 on December 12, 2016.

132.    From at least June 2011 and continuing, DaVita submitted a significant number of claims for payment to Medicare for lab services provided to patients under CPT 80202

(Vancomycin (antibiotic) level), all of which were false for lacking method validation with respect to its modifications to the manufacturer's FDA-approved instructions. *See* 42 C.F.R. § 493.1253.

133.    Based on this example, which is representative of other modified FDA-approved tests lacking method validation for specimen stability, DaVita falsely submitted claims for payment to Medicare by billing for tests that were outside the storage conditions required to produce accurate test results.

134.    DaVita falsely submitted claims for payment to Government payors by billing for tests that were outside FDA-approved guidelines and were not validated pursuant to CLIA regulations to ensure accurate results and, therefore, were not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member," which is material to, and a precondition of, the Government's decision to pay. 42 U.S.C. § 1395y(a)(1)(A).

135.    DaVita knowingly and fraudulently retained each payment that was improperly received from Medicare, Medicaid, and other Government payors based upon its failure to validate deviations from FDA-approved instructions regarding specimen stability.

**(Method Validations)**

136.    DaVita failed to perform method validations, which were required by CLIA and were material to the Government's decision to pay for such claims, on certain tests billed to Government payors.

137.     For example, to ensure accurate test results, the manufacturer's FDA-approved package insert instructions for EDTA tubes, which are used in special chemistry testing,

require specimens to be centrifuged[9] for ten minutes at a force of 1500 $g$ in order to adequately separate the liquid portion (i.e., serum or plasma) from the cellular elements (i.e., red blood cells, white blood cells, and platelets) of a blood specimen. The manufacturer requires centrifugation because residual cellular elements and other microparticles adversely affect the testing process.

138.    Throughout Relators' entire employment, DaVita routinely tested (and billed for) specimens outside of the manufacturer's FDA-approved requirement that the specimen be centrifuged for at least ten minutes at a force of 1500 $g$ to prevent erroneous test results for the following tests:

    1.    Ferritin (blood protein) level (CPT 82728);

    2.    Parathormone (parathyroid hormone) level (CPT 83970);

    3.    Hepatitis B core antibody measurement (CPT 86704);

    4.    Hepatitis B surface antibody measurement (CPT 86706);

    5.    Detection test for Hepatitis B surface antigen (CPT 87340);

    6.    Detection test for Hepatitis B surface antigen (CPT 87341);

    7.    Hepatitis C antibody measurement (CPT 86803);

    8.    Detection test for Hepatitis C virus (CPT 87522);

---

[9] Blood specimens consist of a liquid component (i.e., serum or plasma) and solid components (i.e., red blood cells, white blood cells, platelets, and fibrin clot). Many lab tests are performed only on the liquid component of the specimen, which necessarily requires separation of the liquid component from the solid components prior to testing. This is accomplished by centrifuging (spinning) a specimen tube for a given length of time at a given force within a certain amount of time after collection, as defined by the manufacturer. Failure to perform centrifugation within the specification defined by the manufacturer can cause inaccurate results due to physical or chemical contamination of the serum or plasma used for testing.

9.      Digoxin level (CPT 80162);

10.     Phenytoin level (CPT 80185);

11.     Gentamicin (antibiotic) level (CPT 80170); and

12.     Vancomycin (antibiotic) level (CPT 80202).

139.    In fact, DaVita's own Standard Operating Procedure for the use of EDTA tubes in special chemistry testing requires centrifugation for only five minutes and fails to specifically require a force of 1500 *g*.

140.    While outside of the manufacturer's FDA-approved package insert instructions, DaVita neither performed nor documented any method validation with regard to its modified use of EDTA tubes in special chemistry testing *before reporting (and billing Government payors for) patient test results*, which is required by CLIA and is material to, and a precondition of, payment by Medicare, Medicaid, and all other Government payors. *See* 42 C.F.R. § 493.1253.

141.    Specifically, as an actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on January 20, 2017, for lab services provided to Patient W on December 6, 2016, under CPT 82728 (Ferritin (blood protein) level). DaVita billed Medicare in the amount of $184.37 on this claim, and Medicare paid $18.20 on February 3, 2017.

142.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient OO on January 6,

2016, under CPT 82728 (Ferritin (blood protein) level). DaVita billed Medicare in the amount of $184.37 on this claim, and Medicare paid $18.20 on January 3, 2017.

143.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on October 28, 2016, for lab services provided to Patient N on November 3, 2015, under CPT 83970 (Parathormone (parathyroid hormone) level). DaVita billed Medicare in the amount of $558.68 on this claim, and Medicare paid $20.64 on November 14, 2016.

144.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient KK on March 30, 2016, under CPT 83970 (Parathormone (parathyroid hormone) level). DaVita billed Medicare in the amount of $558.68 on this claim, and Medicare paid $24.50 on January 3, 2017.

145.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on January 26, 2016, for lab services provided to Patient Y on May 4, 2015, under CPT 86704 (Hepatitis B core antibody measurement). DaVita billed Medicare in the amount of $163.11 on this claim, and Medicare paid $16.07 on May 27, 2016.

146.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on June 22, 2015, for lab services provided to Patient QQ on April 27, 2015,

under CPT 86704 (Hepatitis B core antibody measurement). DaVita billed Medicare in the amount of $163.11 on this claim, and Medicare paid $16.07 on July 6, 2015.

147.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 27, 2016, for lab services provided to Patient T on June 6, 2016, under CPT 86706 (Hepatitis B surface antibody measurement). DaVita billed Medicare in the amount of $145.34 on this claim, and Medicare paid $14.34 on January 10, 2017.

148.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 16, 2016, for lab services provided to Patient WW on July 13, 2015, under CPT 86706 (Hepatitis B surface antibody measurement). DaVita billed Medicare in the amount of $145.34 on this claim, and Medicare paid $14.33 on March 1, 2016.

149.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient Z on March 11, 2016, under CPT 87340 (Detection test for Hepatitis B surface antigen). DaVita billed Medicare in the amount of $139.77 on this claim, and Medicare paid $2.07 on January 3, 2017.

150.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 1, 2017, for lab services provided to Patient BBB on November 8,

2016, under CPT 87340 (Detection test for Hepatitis B surface antigen). DaVita billed Medicare in the amount of $139.77 on this claim, and Medicare paid $13.79 on February 15, 2017.

151.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on July 15, 2015, for lab services provided to Patient EE on April 30, 2015, under CPT 87341 (Detection test for Hepatitis B surface antigen). DaVita billed Medicare in the amount of $139.77 on this claim, and Medicare paid $13.78 on October 1, 2015.

152.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on February 25, 2015, for lab services provided to Patient J on February 16, 2015, under CPT 86803 (Hepatitis C antibody measurement). DaVita billed Medicare in the amount of $193.16 on this claim, and Medicare paid $19.03 on March 11, 2015.

153.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on March 27, 2017, for lab services provided to Patient FF on July 20, 2016, under CPT 86803 (Hepatitis C antibody measurement). DaVita billed Medicare in the amount of $193.16 on this claim, and Medicare paid $19.05 on April 13, 2017.

154.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on January 26, 2016, for lab services provided to Patient U on October 14,

2015, under CPT 87522 (Detection test for Hepatitis C virus). DaVita billed Medicare in the amount of $384.05 on this claim, and Medicare paid $57.12 on June 1, 2016.

155.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on July 14, 2016, for lab services provided to Patient GG on November 4, 2015, under CPT 87522 (Detection test for Hepatitis C virus). DaVita billed Medicare in the amount of $384.05 on this claim, and Medicare paid $57.12 on July 21, 2016.

156.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on February 8, 2016, for lab services provided to Patient K on February 1, 2016, under CPT 80162 (Digoxin level). DaVita billed Medicare in the amount of $179.74 on this claim, and Medicare paid $17.73 on February 22, 2016.

157.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on July 8, 2016, for lab services provided to Patient HH on September 9, 2015, under CPT 80162 (Digoxin level). DaVita billed Medicare in the amount of $179.74 on this claim, and Medicare paid $17.71 on July 18, 2016.

158.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on July 21, 2016, for lab services provided to Patient F on August 12, 2015, under CPT 80185 (Phenytoin level). DaVita billed Medicare in the amount of $179.46 on this claim, and Medicare paid $17.68 on July 28, 2016.

159.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on June 24, 2015, for lab services provided to Patient XX on June 9, 2015, under CPT 80185 (Phenytoin level). DaVita billed Medicare in the amount of $179.46 on this claim, and Medicare paid $17.68 on July 8, 2015.

160.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on November 4, 2016, for lab services provided to Patient X on August 15, 2016, under CPT 80170 (Gentamicin (antibiotic) level). DaVita billed Medicare in the amount of $221.89 on this claim, and Medicare paid $1.57 on November 18, 2016.

161.    Specifically, as an actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient BB on January 6, 2016, under CPT 80202 (Vancomycin (antibiotic) level). DaVita billed Medicare in the amount of $183.33 on this claim, and Medicare paid $18.09 on January 3, 2017.

162.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on November 28, 2016, for lab services provided to Patient II on October 20, 2016, under CPT 80202 (Vancomycin (antibiotic) level). DaVita billed Medicare in the amount of $183.33 on this claim, and Medicare paid $1.09 on December 12, 2016.

163.    From at least June 2011 and continuing, DaVita submitted a significant number of claims for payment to Medicare for lab services provided to patients under the listed

CPTs, representative examples of which are provided above and all of which were false

for lacking method validation with respect to its modifications to the manufacturer's

FDA-approved instructions: 82728 (Ferritin (blood protein) level); 83970 (Parathormone

(parathyroid hormone) level); 86704 (Hepatitis B core antibody measurement); 86706

(Hepatitis B surface antibody measurement); 87340 (Detection test for Hepatitis B

surface antigen); 87341 (Detection test for Hepatitis B surface antigen); 86803 (Hepatitis

C antibody measurement); 87522 (Detection test for Hepatitis C virus); 80162 (Digoxin

level); 80185 (Phenytoin level); 80170 (Gentamicin (antibiotic) level); and 80202

(Vancomycin (antibiotic) level). *See* 42 C.F.R. § 493.1253.

164.    As another example, throughout Relators' entire employment, DaVita routinely

tested (and billed for) specimens outside of the manufacturer's FDA-approved

requirement that the specimen's liquid portion be separated from its cellular elements

within two hours of collection to prevent erroneous test results for the same twelve tests

referenced above:

1.    Ferritin (blood protein) level (CPT 82728);

2.    Parathormone (parathyroid hormone) level (CPT 83970);

3.    Hepatitis B core antibody measurement (CPT 86704);

4.    Hepatitis B surface antibody measurement (CPT 86706);

5.    Detection test for Hepatitis B surface antigen (CPT 87340);

6.    Detection test for Hepatitis B surface antigen (CPT 87341);

7.    Hepatitis C antibody measurement (CPT 86803);

8.    Detection test for Hepatitis C virus (CPT 87522);

9.  Digoxin level (CPT 80162);

10.  Phenytoin level (CPT 80185);

11.  Gentamicin (antibiotic) level (CPT 80170); and

12.  Vancomycin (antibiotic) level (CPT 80202).

165.  For the listed tests, DaVita not only failed to separate the liquid portion of the specimen from the cellular elements within two hours prior to its lengthy transport, but DaVita also failed to utilize more expensive gel collection tubes, which have a thick Vaseline-like layer that separates and forms a barrier between the liquid portion of the specimen and the cellular elements, maintaining and satisfying the manufacturer's FDA-approved two-hour separation requirement. By not requiring separation prior to transport and using less expensive non-gel collection tubes for transport, DaVita did not (and could not) ensure specimen stability for the additional storage time in transit.

166.  While outside of the manufacturer's FDA-approved package insert instructions, DaVita neither performed nor documented any method validation with regard to its modified test processes for the listed tests *before reporting (and billing Government payors for) patient test results*, which is required by CLIA and is material to, and a precondition of, payment by Medicare, Medicaid, and all other Government payors. *See* 42 C.F.R. § 493.1253.

167.  From at least June 2011 and continuing, DaVita submitted a significant number of claims for payment to Medicare for lab services provided to patients under the listed CPTs, representative examples of which are provided above and all of which were false for lacking method validation with respect to its modifications to the manufacturer's

FDA-approved instructions: 82728 (Ferritin (blood protein) level); 83970 (Parathormone (parathyroid hormone) level); 86704 (Hepatitis B core antibody measurement); 86706 (Hepatitis B surface antibody measurement); 87340 (Detection test for Hepatitis B surface antigen); 87341 (Detection test for Hepatitis B surface antigen); 86803 (Hepatitis C antibody measurement); 87522 (Detection test for Hepatitis C virus); 80162 (Digoxin level); 80185 (Phenytoin level); 80170 (Gentamicin (antibiotic) level); and 80202 (Vancomycin (antibiotic) level). *See* 42 C.F.R. § 493.1253.

168.    As another example, in late 2015, DaVita began using smaller, standard gel collection tubes for general chemistry testing in place of its larger, custom-made, and more expensive double-gel collection tubes.

169.    Despite being required by CLIA and DaVita's accrediting entity CAP to revalidate its testing methods due to the change in collection tubes, DaVita neither performed nor documented any method validation for using the smaller, less expensive standard gel collection tubes *before reporting (and billing Government payors for) patient test results* in the following general chemistry tests:

  1.   Liver enzyme (SGPT) level (CPT 84460);

  2.   Blood test, lipids (cholesterol and triglycerides) (CPT 80061);

  3.   Blood test, thyroid stimulating hormone (TSH) (CPT 84443);

  4.   Prostate cancer screening; prostate specific antigen test (psa) (CPT G0103);

  5.   Bilirubin level (CPT 82247);

  6.   Uric acid level, blood (CPT 84550);

  7.   PSA (prostate specific antigen) measurement (CPT 84153);

8.     Vitamin D-3 level (CPT 82306);

9.     Creatine kinase (cardiac enzyme) level (CPT 82550);

10.    Thyroxine (thyroid chemical) measurement (CPT 84439);

11.    Kidney function blood test panel (CPT 80069);

12.    Thyroxine (thyroid chemical) measurement (CPT 84436);

13.    Glutamyltransferase (liver enzyme) level (CPT 82977);

14.    Thyroid hormone, T3 measurement (CPT 84481);

15.    Creatinine level to test for kidney function or muscle injury (CPT 82570);

16.    Thyroid hormone, T3 measurement (CPT 84480); and

17.    Blood test, comprehensive group of blood chemicals (CPT 80053).

*See* 42 C.F.R. § 493.1253.

170.    Revalidating its testing methods due to the change in collection tubes is required by CLIA and is material to, and a precondition of, payment by Medicare, Medicaid, and all other Government payors. *See* 42 C.F.R. § 493.1253.

171.    Specifically, as an actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on April 13, 2017, for lab services provided to Patient B on September 14, 2016, under CPT 84460 (Liver enzyme (SGPT) level). DaVita billed Medicare in the amount of $71.63 on this claim, and Medicare paid $6.96 on April 27, 2017.

172.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on March 15, 2017, for lab services provided to Patient DDD on May 24, 2016,

-49-

under CPT 84460 (Liver enzyme (SGPT) level). DaVita billed Medicare in the amount of $71.63 on this claim, and Medicare paid $6.96 on March 29, 2017.

173.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on March 24, 2017, for lab services provided to Patient AA on July 5, 2016, under CPT 80061 (Blood test, lipids (cholesterol and triglycerides)). DaVita billed Medicare in the amount of $181.35 on this claim, and Medicare paid $17.88 on April 13, 2017.

174.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 14, 2017, for lab services provided to Patient JJ on March 25, 2016, under CPT 80061 (Blood test, lipids (cholesterol and triglycerides)). DaVita billed Medicare in the amount of $181.35 on this claim, and Medicare paid $17.88 on February 28, 2017.

175.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on February 17, 2017, for lab services provided to Patient S on April 15, 2016, under CPT 84443 (Blood test, thyroid stimulating hormone (TSH)). DaVita billed Medicare in the amount of $227.37 on this claim, and Medicare paid $22.43 on March 3, 2017.

176.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to

Medicare on February 8, 2016, for lab services provided to Patient HHH on January 20, 2016, under CPT 84443 (Blood test, thyroid stimulating hormone (TSH)). DaVita billed Medicare in the amount of $227.37 on this claim, and Medicare paid $22.43 on February 22, 2016.

177.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on January 27, 2016, for lab services provided to Patient E on January 8, 2016, under CPT G0103 (Prostate cancer screening; prostate specific antigen test (psa)). DaVita billed Medicare in the amount of $248.91 on this claim, and Medicare paid $24.56 on February 10, 2016.

178.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 10, 2016, for lab services provided to Patient MM on February 3, 2016, under CPT G0103 (Prostate cancer screening; prostate specific antigen test (psa)). DaVita billed Medicare in the amount of $248.91 on this claim, and Medicare paid $24.56 on February 24, 2016.

179.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on June 15, 2017, for lab services provided to Patient P on October 11, 2016, under CPT 82247 (Bilirubin level). DaVita billed Medicare in the amount of $67.95 on this claim, and Medicare paid $4.29 on June 29, 2017.

180.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 8, 2016, for lab services provided to Patient PP on February 1, 2016, under CPT 82247 (Bilirubin level). DaVita billed Medicare in the amount of $67.95 on this claim, and Medicare paid $2.74 on February 22, 2016.

181.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient L on June 20, 2016, under CPT 84550 (Uric acid level, blood). DaVita billed Medicare in the amount of $61.14 on this claim, and Medicare paid $1.80 on January 3, 2017.

182.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on July 8, 2016, for lab services provided to Patient AAA on December 10, 2015, under CPT 84550 (Uric acid level, blood). DaVita billed Medicare in the amount of $61.14 on this claim, and Medicare paid $3.19 on July 15, 2016.

183.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on February 2, 2016, for lab services provided to Patient O on January 25, 2016, under CPT 84153 (PSA (prostate specific antigen) measurement). DaVita billed Medicare in the amount of $248.91 on this claim, and Medicare paid $24.56 on February 16, 2016.

184.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient FFF on April 1, 2016, under CPT 84153 (PSA (prostate specific antigen) measurement). DaVita billed Medicare in the amount of $248.91 on this claim, and Medicare paid $23.53 on January 5, 2017.

185.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on June 5, 2017, for lab services provided to Patient R on November 30, 2016, under CPT 82306 (Vitamin D-3 level). DaVita billed Medicare in the amount of $400.68 on this claim, and Medicare paid $5.92 on June 19, 2017.

186.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient RR on June 5, 2016, under CPT 82306 (Vitamin D-3 level). DaVita billed Medicare in the amount of $400.68 on this claim, and Medicare paid $5.92 on January 12, 2017.

187.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on July 18, 2016, for lab services provided to Patient C on December 10, 2015, under CPT 82550 (Creatine kinase (cardiac enzyme) level). DaVita billed Medicare in the amount of $88.17 on this claim, and Medicare paid $6.95 on July 25, 2016.

188.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 11, 2016, for lab services provided to Patient LL on February 4, 2016, under CPT 82550 (Creatine kinase (cardiac enzyme) level). DaVita billed Medicare in the amount of $88.17 on this claim, and Medicare paid $5.24 on February 25, 2016.

189.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 7, 2016, for lab services provided to Patient D on November 16, 2016, under CPT 84439 (Thyroxine (thyroid chemical) measurement). DaVita billed Medicare in the amount of $122.09 on this claim, and Medicare paid $1.80 on December 22, 2016.

190.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient ZZ on July 5, 2016, under CPT 84439 (Thyroxine (thyroid chemical) measurement). DaVita billed Medicare in the amount of $122.09 on this claim, and Medicare paid $4.90 on January 4, 2017.

191.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 27, 2016, for lab services provided to Patient H on May 3, 2016, under CPT 80069 (Kidney function blood test panel). DaVita billed Medicare in the amount of $117.46 on this claim, and Medicare paid $3.60 on January 10, 2017.

192.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on April 14, 2016, for lab services provided to Patient EEE on March 10, 2016, under CPT 80069 (Kidney function blood test panel). DaVita billed Medicare in the amount of $117.46 on this claim, and Medicare paid $11.59 on April 28, 2016.

193.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient A on March 22, 2016, under CPT 84436 (Thyroxine (thyroid chemical) measurement). DaVita billed Medicare in the amount of $92.99 on this claim, and Medicare paid $1.83 on January 3, 2017.

194.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 8, 2016, for lab services provided to Patient DD on January 28, 2016, under CPT 84436 (Thyroxine (thyroid chemical) measurement). DaVita billed Medicare in the amount of $92.99 on this claim, and Medicare paid $9.16 on February 22, 2016.

195.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient G on June 21, 2016, under CPT 82977 (Glutamyltransferase (liver enzyme) level). DaVita billed Medicare in the amount of $97.43 on this claim, and Medicare paid $4.01 on January 5, 2017.

196.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 10, 2016, for lab services provided to Patient TT on February 3, 2016, under CPT 82977 (Glutamyltransferase (liver enzyme) level). DaVita billed Medicare in the amount of $97.43 on this claim, and Medicare paid $5.70 on February 24, 2016.

197.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 7, 2016, for lab services provided to Patient D on November 16, 2016, under CPT 84481 (Thyroid hormone, T3 measurement). DaVita billed Medicare in the amount of $212.81 on this claim, and Medicare paid $3.15 on December 22, 2016.

198.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on January 13, 2016, for lab services provided to Patient UU on December 29, 2015, under CPT 84481 (Thyroid hormone, T3 measurement). DaVita billed Medicare in the amount of $212.81 on this claim, and Medicare paid $20.97 on January 27, 2016.

199.     Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 27, 2016, for lab services provided to Patient V on August 10, 2016, under CPT 82570 (Creatinine level to test for kidney function or muscle injury). DaVita billed Medicare in the amount of $70.02 on this claim, and Medicare paid $6.91 on January 13, 2017.

-56-

200.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on February 25, 2019, for lab services provided to Patient VV on March 2, 2016, under CPT 82570 (Creatinine level to test for kidney function or muscle injury). DaVita billed Medicare in the amount of $70.02 on this claim, and Medicare paid $6.91 on March 27, 2019.

201.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on February 8, 2016, for lab services provided to Patient CC on January 28, 2016, under CPT 84480 (Thyroid hormone, T3 measurement). DaVita billed Medicare in the amount of $191.93 on this claim, and Medicare paid $18.92 on February 22, 2016.

202.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on April 14, 2016, for lab services provided to Patient CCC on March 18, 2016, under CPT 84480 (Thyroid hormone, T3 measurement). DaVita billed Medicare in the amount of $191.93 on this claim, and Medicare paid $18.92 on April 28, 2016.

203.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on January 28, 2019, for lab services provided to Patient YY on January 11, 2016, under CPT 80053 (Blood test, comprehensive group of blood chemicals). DaVita billed Medicare in the amount of $143.07 on this claim, and Medicare paid $9.88 on March 4, 2019.

204.    From at least June 2011 and continuing, DaVita submitted a significant number of claims for payment to Medicare for lab services provided to patients under the listed CPTs, representative examples of which are provided above and all of which were false for lacking method validation with respect to its modifications to the manufacturer's FDA-approved instructions: 84460 (Liver enzyme (SGPT) level); 80061 (Blood test, lipids (cholesterol and triglycerides)); 84443 (Blood test, thyroid stimulating hormone (TSH)); G0103 (Prostate cancer screening; prostate specific antigen test (psa)); 82247 (Bilirubin level); 84550 (Uric acid level, blood); 84153 (PSA (prostate specific antigen) measurement); 82306 (Vitamin D-3 level); 82550 (Creatine kinase (cardiac enzyme) level); 84439 (Thyroxine (thyroid chemical) measurement); 80069 (Kidney function blood test panel); 84436 (Thyroxine (thyroid chemical) measurement); 82977 (Glutamyltransferase (liver enzyme) level); 84481 (Thyroid hormone, T3 measurement); 82570 (Creatinine level to test for kidney function or muscle injury); 84480 (Thyroid hormone, T3 measurement); and 80053 (Blood test, comprehensive group of blood chemicals). *See* 42 C.F.R. § 493.1253.

205.    In February 2017, Relator Holland discovered DaVita lacked validation studies regarding specimen stability for a new instrument used to test Hepatitis C RNA by polymerase-chain reaction ("PCR") and for all prior instruments performing this test, despite continuing to submit claims to the Government for payment. Relator Holland further discovered that DaVita had been routinely testing specimens for Hepatitis C RNA by PCR outside of the manufacturer's FDA-approved requirement that the liquid portion (i.e., serum or plasma) be separated from the cellular elements (i.e., red blood cells, white

blood cells, and platelets) within 24 hours of collection. With lengthy transport and accessioning times, DaVita was unable to comply with the 24-hour requirement using the established collection process, yet had not performed any CLIA-required validation studies to ensure the additional storage time did not adversely affect the results.

206. Despite receiving pushback from his supervisors because of the financial consequences, Relator Holland successfully corrected the Hepatitis C RNA by PCR stability issues relating to the manufacturer's FDA-approved 24-hour separation requirement by instituting the use of more expensive collection tubes, which employed a thick Vaseline-like layer to separate and maintain a barrier between the liquid portion of the specimen and the cellular elements. Relator Holland's supervisors agreed that DaVita could not ensure the accuracy of prior Hepatitis C RNA by PCR testing results, which were produced outside of the manufacturer's FDA-approved instructions and were not validated pursuant to CLIA regulations, and that Government payors were subject to a significant refund. As a result of DaVita's failure to comply with CLIA's regulations and DaVita's knowledge that its failure to comply with these regulations was material to the Government's decision to pay for lab tests, DaVita paid money back to the Government as a refund for the prior Hepatitis C RNA by PCR tests.

207. Similarly, DaVita routinely tested specimens for HCV antibody outside of the manufacturer's FDA-approved requirement that the liquid portion (i.e., serum or plasma) be separated from the cellular elements (i.e., red blood cells, white blood cells, and platelets) within 24 hours of collection. With lengthy transport and accessioning times, DaVita was unable to comply with the 24-hour requirement using the established

collection process, yet had not performed any CLIA-required validation studies to ensure the additional storage time did not adversely affect the results, despite continuing to submit claims to the Government for payment. With knowledge of its prior conduct resulting in a refund to Government payors, DaVita implemented use of the same more expensive collection tubes for this test as well, yet failed to refund money paid by Government payors for previous test results, the accuracy of which DaVita could not ensure.

208.    Specifically, as an actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on February 25, 2015, for lab services provided to Patient J on February 16, 2015, under CPT 86803 (Hepatitis C antibody measurement). DaVita billed Medicare in the amount of $193.16 on this claim, and Medicare paid $19.03 on March 11, 2015.

209.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on March 27, 2017, for lab services provided to Patient FF on July 20, 2016, under CPT 86803 (Hepatitis C antibody measurement). DaVita billed Medicare in the amount of $193.16 on this claim, and Medicare paid $19.05 on April 13, 2017.

210.    From at least June 2011 and continuing, DaVita submitted a significant number of claims for payment to Medicare for lab services provided to patients under CPT 86803 (Hepatitis C antibody measurement), all of which were false for lacking method validation with respect to its modifications to the manufacturer's FDA-approved instructions. *See* 42 C.F.R. § 493.1253.

211.    As further example, DaVita failed to perform, and obtain its CLIA medical director's approval and signature for, the requisite method validations *before reporting (and billing Government payors for) patient test results* for the following lab tests:

    1.    Glucose (sugar) level on body fluid (CPT 82945);

    2.    Zinc level (CPT 84630) (until July 2015); and

    3.    Aluminum level (CPT 82108) (until July 2015).

212.    Validating its testing methods for the listed tests is required by CLIA and is material to, and a precondition of, payment by Medicare, Medicaid, and all other Government payors. *See* 42 C.F.R. § 493.1253.

213.    Specifically, as an actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on January 26, 2015, for lab services provided to Patient I on January 15, 2015, under CPT 82945 (Glucose (sugar) level on body fluid). DaVita billed Medicare in the amount of $53.11 on this claim, and Medicare paid $5.23 on February 9, 2015.

214.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on October 28, 2016, for lab services provided to Patient NN on September 22, 2016, under CPT 82945 (Glucose (sugar) level on body fluid). DaVita billed Medicare in the amount of $53.11 on this claim, and Medicare paid $1.18 on November 17, 2016.

215.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on July 26, 2016, for lab services provided to Patient M on September 2, 2015,

under CPT 84630 (Zinc level). DaVita billed Medicare in the amount of $154.13 on this claim, and Medicare paid $15.19 on August 3, 2016.

216.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on July 8, 2016, for lab services provided to Patient SS on August 10, 2015, under CPT 84630 (Zinc level). DaVita billed Medicare in the amount of $154.13 on this claim, and Medicare paid $15.19 on July 15, 2016.

217.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as Total Renal Laboratories, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient Q on March 31, 2016, under CPT 82108 (Aluminum level). DaVita billed Medicare in the amount of $344.83 on this claim, and Medicare paid $10.20 on January 3, 2017.

218.    Specifically, as an additional actual false claim representative of others, DaVita (doing business as DVA Laboratory Services, Inc.) submitted a claim for payment to Medicare on December 19, 2016, for lab services provided to Patient GGG on May 26, 2016, under CPT 82108 (Aluminum level). DaVita billed Medicare in the amount of $344.83 on this claim, and Medicare paid $14.06 on January 3, 2017.

219.    From at least June 2011 and continuing, DaVita submitted a significant number of claims for payment to Medicare for lab services provided to patients under the listed CPTs, representative examples of which are provided above and all of which were false for lacking method validation with respect to its modifications to the manufacturer's FDA-approved instructions: 82945 (Glucose (sugar) level on body fluid); 84630 (Zinc

level) (until July 2015); and 82108 (Aluminum level) (until July 2015). *See* 42 C.F.R. § 493.1253.

220.    Based on these examples, which are representative of other modified FDA-approved tests lacking method validation, DaVita falsely submitted claims for payment to Medicare by billing for tests that were outside the manufacturer-tested conditions required to produce accurate test results.

221.    DaVita falsely submitted claims for payment to Government payors by billing for tests that were outside FDA-approved guidelines and were not validated pursuant to CLIA regulations to ensure accurate results and, therefore, were not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member," which is material to, and a precondition of, the Government's decision to pay. 42 U.S.C. § 1395y(a)(1)(A).

222.    DaVita also failed to obtain explicit approval from the New York Department of Health or establish performance specifications for accuracy, precision, analytical sensitivity and specificity, reportable range of results, reference intervals, and other applicable performance characteristics for deviations from the FDA-approved guidelines for each of the tests listed above.  As a result, DaVita falsely submitted claims for payment to Medicare, the New York Medicaid Program, and other Government payors by billing for tests on New York specimens that were outside FDA-approved guidelines and that had not received prior approval from the New York Department of Health.

223.    DaVita knowingly and fraudulently retained each payment that was improperly received from Medicare, Medicaid, and other Government payors based upon its failure

to validate deviations from FDA-approved instructions developed to ensure the reliability and accuracy of test results.

## II.      Provision of False Information to Accrediting Entity

224.    All clinical laboratories must be properly certified by CLIA or be CLIA-exempt in order to receive Medicare or Medicaid payments. 42 C.F.R. § 493.3.

225.    Medicare Part B will only reimburse for diagnostic laboratory tests furnished by a laboratory that is in compliance with CLIA regulations. *See* 42 C.F.R. §§ 410.12 and 410.32(d).

226.    DaVita was required to certify compliance with CLIA regulations in order to obtain and maintain its CLIA certificate.

227.    Laboratories that perform moderate and high complexity tests can obtain a CLIA certificate of accreditation by meeting the standards of a private, non-profit accreditation organization approved by CMS. *See* 42 C.F.R. §§ 493.5, 493.551.

228.    A non-profit accreditation organization's requirements must equal or exceed CLIA program requirements to receive CMS approval. *See* 42 C.F.R. § 493.551.

229.    At all times relevant to this Second Amended Complaint, DaVita possessed a CLIA certificate of accreditation and was accredited by the CAP, a CMS-approved accrediting agency. *See* 42 C.F.R. §§ 493.5, 493.551.

230.    However, DaVita provided false and incomplete information to the CAP, CMS, and state licensing agencies in order to obtain and retain accreditation.

231.    For example, the CAP, CMS, and state licensing agencies require a lab to document and provide a list of LDTs, including tests developed in-house, as well as

modified FDA-approved tests implemented by the lab to help the inspector review the analytic validation data for these tests.

232.    Throughout Relators' entire employment, DaVita did not document or provide to the CAP, CMS, or state licensing agencies' inspector a list of the above-referenced FDA-approved tests that were modified by DaVita as required.

233.    As a result of the false and incomplete information DaVita provided to the CAP, CMS, and state licensing agencies, the inspectors were unaware of the absence of analytic validation data for the above-referenced modifications DaVita made to FDA-approved tests.

234.    If DaVita had provided this correct and complete information to the CAP, CMS, and state licensing agencies, the inspectors would have identified the absence of analytic validation data for the modifications DaVita made to FDA-approved tests, which would have resulted in DaVita's noncompliance with the accreditation criteria and the loss of DaVita's CLIA certification.

235.    DaVita fraudulently obtained and retained accreditation from the CAP and state licensing agencies by providing false and incomplete information to the CAP, CMS, and state licensing agencies and by failing to meet their accreditation criteria with regard to validation data for modified FDA-approved tests.

236.    As a result, the CLIA certificate of accreditation possessed by DaVita in order to receive payments from Government payors was obtained through false statements, therefore all claims for payment based on its fraudulently obtained CLIA certificate (representative examples of which are provided in paragraphs 130-31, 141-62, 171-203,

208-09, and 213-18 above) are false.

237.    DaVita knowingly and fraudulently retained each payment that was improperly received from Medicare, Medicaid, and other Government payors based upon the provision of false information to its accrediting entities.

### III.    Fraudulent Inducement to Enter Government Contracts

238.    DaVita fraudulently induced the Government to enter into a specific Provider Enrollment Agreement to reimburse DaVita for medical services provided to Government beneficiaries by affirmatively committing "to fully abide by the statutes, regulations, and program instructions of the Medicare [P]rogram" (including all CLIA regulations promulgated by CMS pursuant to the Medicare Program) or be "denied entry to or revoked from the Medicare [P]rogram . . ." if any requirements are not met. CMS-855B, Medicare Enrollment Application for Clinics, Group Practices, and Certain Other Suppliers.

239.    DaVita also fraudulently induced the Government to enter into a specific Provider Enrollment Agreement to reimburse DaVita for medical services provided to Government beneficiaries by "agree[ing] to abide by the Medicare laws, regulations and program instructions that apply to [DaVita]" and by certifying its "understand[ing] that payment of a claim by Medicare is conditioned [not only] upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . [but also] on [DaVita's] compliance with all applicable conditions of participation in Medicare. *Id.*

240.     Additionally, DaVita fraudulently induced the Government to enter into a specific Provider Enrollment Agreement to reimburse DaVita for medical services provided to Government beneficiaries by agreeing "that any existing or future overpayment made to [DaVita] by the Medicare program may be recouped by Medicare through the withholding of future payments.

241.     DaVita's prospective promises and certifications to comply with the statutes, regulations, and program instructions of the Medicare Program (including all CLIA regulations promulgated by CMS pursuant to the Medicare Program), which were specifically made at the time of enrollment by DaVita's corporate officer on October 1, 1992 (for Defendant Total Renal Laboratories, Inc.) and on November 9, 1984 (for Defendant DVA Laboratory Services, Inc.) and at the time of reenrollment at least every five years thereafter, were false when made, and the Government would not have entered into a Provider Enrollment Agreement with DaVita to pay claims associated with its contracted services had it known of DaVita's unwillingness to comply with such rules.

242.     Furthermore, in order to bill or receive funds from Medicare, CMS requires DaVita (upon the submission of each claim for payment on CMS Form 1500) to certify that it has "provided or will provide sufficient information required to allow the [G]overnment to make an informed eligibility and payment decision;" that the "claim . . . complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment;" and that "the services . . . were medically necessary." By making these certifications on each CMS Form 1500 submitted and providing misleadingly incomplete information regarding its noncompliance with the statutes,

-67-

regulations, and program instructions of the Medicare Program (including all CLIA regulations promulgated by CMS pursuant to the Medicare Program), DaVita fraudulently induced the Government to enter contracts to pay claims that it otherwise would not have paid. Specifically, DaVita's false certification of compliance with CLIA regulations enacted to ensure the accuracy and reliability of test results, which was material to the Government's decision to reimburse DaVita for medical services provided to Government beneficiaries, was misleadingly incomplete such that it amounted to fraud.

243.    Additionally, because DaVita was required to possess a CLIA certificate in order to seek federally-funded reimbursement and obtained its CLIA certificate through the provision of intentionally misleading and incomplete information to the CAP, DaVita fraudulently induced the Government to pay claims that it otherwise would not have paid.

244.    The original fraud that influenced the Government's decision to enter into a Provider Enrollment Agreement or pay a claim submitted on a CMS Form 1500 and pursuant to a CLIA certificate "pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *Marsteller*, 880 F.3d at 1314. DaVita's false and fraudulent statements and omissions, which were material to the Government's decision to pay and had a natural tendency to influence the payment of money, were designed and offered to induce the Government to enter contracts in reliance thereof and to pay DaVita for laboratory testing and services.

245.    DaVita's omission of critical qualifying information and material facts regarding its compliance with regulations, which were designed to ensure stable and viable

specimens of optimum integrity in order to produce accurate and medically necessary test results, was an actionable misrepresentation intended to induce the Government to pay money it otherwise would not have paid and resulted in false claims (representative examples of which are provided in paragraphs 130-31, 141-62, 171-203, 208-09, and 213-18 above) being submitted to and paid by Medicare, Medicaid, and other Government payors.

246.    DaVita knowingly and fraudulently retained each payment that was improperly received from Medicare, Medicaid, and other Government payors based upon its misrepresentations, false statements, and certifications to induce such payment.

### DaVita's Knowledge of Fraudulent Conduct

247.    At all times relevant to this Second Amended Complaint, DaVita had actual knowledge that it was disregarding material statutory regulations in the manner described herein and that, as a result of its improper conduct, was asking Medicare, Medicaid, and other Government payors to pay amounts they did not owe.

248.    On numerous occasions, Relators expressed concern to DaVita's senior leadership about DaVita's corporate-wide practices regarding specimen stability and noncompliance with test system validations, but their concerns were rebuffed and remedial action was not taken.

249.    For example, Relator Taylor informed senior leadership at DaVita that peritoneal dialysate testing was not validated pursuant to CLIA regulations, but she was informed that the leadership decided to continue running all peritoneal dialysate testing regardless.

250.    Senior leadership at DaVita resisted all efforts by Relators to perform a rigorous assessment of testing methods to determine those that were out of compliance with the CAP standards due to a lack of completed, documented, and approved validation studies.

251.    During every CAP, CMS, or state licensing inspection throughout Relators' entire employment, DaVita created an atmosphere of non-transparency and not only purposefully delayed production of requested documents but also produced nonresponsive documents or created a legal battle to divert discovery of DaVita's noncompliance.

252.    Furthermore, DaVita knew or should have known that it was performing modified FDA-approved tests but deliberately withheld that information from the accrediting agencies' inspectors in order to avoid being evaluated through a more rigorous standard.

253.    Despite the obvious specimen stability issues presented because of lengthy, bicoastal transport, DaVita made a business decision to establish and maintain its lab services in Florida for tax incentive purposes and to disregard its duty to ensure accurate test results, on which vulnerable dialysis patients' treatment plans were knowingly based.

254.    Upon information and belief, a consulting firm advised DaVita in 2011 or 2012 that it must implement a West Coast lab in order to ensure specimen stability and accurate test results, but DaVita ignored the consulting firm's advice.

255.    In fact, West Coast providers utilizing DaVita's lab services complained on numerous occasions of the unstable results produced by DaVita's East Coast-only labs, but DaVita evaded responsibility by blaming such instability on the general nature of dialysis patients' health.

256.    Upon information and belief, because of the unstable results produced by DaVita's East Coast-only labs, West Coast physicians providing services at a Kaiser Permanente dialysis center managed by DaVita refused to utilize DaVita's lab services.

257.    At all times relevant to this Second Amended Complaint, DaVita recklessly disregarded and deliberately ignored its statutory duty to comply with material CLIA regulations to ensure the accuracy of its test results.

258.    At all times relevant to this Second Amended Complaint, DaVita also recklessly disregarded and deliberately ignored whether its conduct resulted in the presentation of false claims for payment to Government payors.

### Materiality of DaVita's Fraudulent Conduct

259.    The provision of accurate and reliable test results that establish a dialysis patient's treatment plan is the essential service that forms the heart of the bargain upon which the Government pays for DaVita's lab services.

260.    The systemic fraudulent conduct described herein precluded DaVita's ability to provide accurate and reliable test results, a service at the heart of its bargain with the Government, and DaVita's false certification to the contrary was clearly material to the Government's decision to pay claims.

261.    Furthermore, DaVita's compliance with the regulations described herein was material to the Government's decision to pay claims because the regulations relate specifically to ensuring accurate test results, and Medicare, Medicaid, and other Government payors would not have paid claims premised upon test results that DaVita could not have ensured were accurate.

262.    Based upon DaVita's inability to ensure the accuracy of test results, Medicare, Medicaid, and other Government payors would not have paid claims for lab tests that DaVita could not truthfully certify were "reasonable and necessary for the diagnosis and treatment of illness . . . or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

263.    DaVita's compliance with the regulations cited herein was a precondition to receiving reimbursement from Medicare, Medicaid, and all other Government payors, and DaVita's noncompliance with the regulations as described herein resulted in DaVita's presentation of false claims to Medicare, Medicaid, and all other Government payors. To be sure, the requirements to obtain CLIA certification "are the same for Medicare approval." 42 C.F.R. § 493.1.

264.    As an example that DaVita knew compliance with the regulations cited herein was material to the Government's decision to pay and was a precondition to receiving Government reimbursement, DaVita paid Medicare a significant refund for Hepatitis C RNA by PCR tests that were not validated pursuant to CLIA regulations for modified FDA-approved tests.

**<u>Retaliation Against Relator Holland</u>**

265.    Relator Holland complained to his supervisors on numerous occasions regarding DaVita's timeliness in testing specimens and his concern with specimen stability, yet DaVita's management ignored his grievances.

266.    Following his resolution of the Hepatitis C RNA by PCR stability issues relating to the manufacturer's FDA-approved 24-hour separation requirement, which ultimately

resulted in DaVita repaying a large sum of money to Government payors, Relator

Holland began receiving increased corporate pressure to compromise his integrity and

medical judgment. As a result, Relator Holland was forced to resign as DaVita's CLIA

medical director on March 20, 2017, but retained his role as Vice President of

Laboratories and Chief Laboratory Officer.

267.    Relator Holland was ostracized by Mr. Cline, his supervisor, after correcting the

Hepatitis C RNA by PCR stability issues relating to the manufacturer's FDA-approved

24-hour separation requirement and filed a formal complaint with DaVita's human

resource department based upon Mr. Cline's treatment of him.

268.    Soon thereafter, DaVita attempted to shift the blame for the noncompliance issues

identified by Relator Holland onto Relator Holland himself.

269.    On April 24, 2017, DaVita issued a written warning to Relator Holland

threatening to terminate him for the compliance issue he actually discovered and

corrected:

> As the CLIA Medical Director for DaVita Labs and the Chief
> Laboratory Officer for DaVita, Inc., it was Dr. Holland's
> responsibility to ensure the accuracy of all clinical laboratory SOPs
> (relating to the operation of laboratory instrumentation and the tests
> performed by the laboratories under the CLIA Medical Director's
> supervision) and the alignment between said SOPs and the actual
> operations of the laboratories personnel. Between May 13, 2015 and
> December 5, 2016, Dr. Holland signed off on various revisions to
> three SOPs relating to the HCV RNA test. All three SOPs correctly
> called for the centrifugation of blood specimens within 24 hours of
> collection. The actual process followed in the DaVita North Lab
> (the only lab to perform the HCV RNA test), was to spin the
> specimen outside the 24 hour period as approved by the FDA and
> communicated to the laboratory by the instrumentation
> manufacturer. The undetected discrepancy resulted in the
> performance of tests outside the approved parameters for the test,

> namely specimen integrity. Upon review of the SOPs, it was
> reasonable and prudent to expect Dr. Holland to orient himself with
> the operation of the test and instrumentation to ensure alignment
> with the SOPs and to ensure the proper handling of the specimens.

270.    DaVita also issued a Corrective Action Plan to Relator Holland requiring him to develop a comprehensive Standard Operating Procedures template; to ensure the current Standard Operating Procedures would be redesigned to meet this format; and to develop a training program and comprehensive monitoring plan in order to ensure adherence.

271.    Although the task seemed punishing and oppressive given the volume of DaVita's Standard Operating Procedures, Relator Holland immediately began working on the items in the Corrective Action Plan.

272.    Relator Holland informed Keith Carrington, DaVita's Director of Corporate Compliance, that he was concerned about DaVita's lack of method validations.

273.    Relator Holland also informed David Van Wyck, DaVita's Vice President of Clinical Support Services, that he was concerned about DaVita's lack of method validations.

274.    Relator Holland met with Andrew Mohraz, DaVita's Associate General Counsel and Head of Investigations, and discussed the concerns he had regarding DaVita's compliance issues.

275.    On April 25, 2017, DaVita's Chief Medical Officer Allen Nissenson called Relator Holland and pressured him to resign his employment with DaVita.

276.    Thereafter, Dr. Van Wyck began having regular communications with Relator Holland about resigning.

277.    On May 25, 2017, Relator Holland was escorted out of the DaVita lab, and Dr.

Van Wyck informed Relator Holland that DaVita considered that day to be his

resignation date and that his employment was terminated immediately.

278.    DaVita has never provided a reason for Relator Holland's termination.

279.    DaVita wrongfully terminated and constructively discharged Relator Holland

because of his efforts to correct the Hepatitis C RNA by PCR stability issues relating to

the manufacturer's FDA-approved 24-hour separation requirement and to stop continuing

violations regarding DaVita's lack of method validations, of which DaVita was aware.

280.    As a result of DaVita's wrongful termination and constructive discharge, Relator

Holland was unable to secure comparable, full-time employment for over two years and

has suffered substantial economic and non-economic damages.

**<u>Retaliation Against Relator Taylor</u>**

281.    Relator Taylor took over as DaVita's CLIA Medical Director following Relator

Holland's termination and witnessed, firsthand, DaVita's ostracization of Relator

Holland.

282.    On May 26, 2017, Relator Taylor informed Dr. Van Wyck and Sharon Alpizar,

DaVita's then-Director of People Services, that she was unhappy with how DaVita was

treating Relator Holland and that she had serious concerns about the competencies of

DaVita's medical technologist and requests by clinicians to change lab results.

283.    Just over one week later, on June 5, 2017, Dr. Van Wyck and Ms. Alpizar

informed Relator Taylor that she had 90 days to resign and that, effective immediately,

she was no longer responsible for DaVita's Quality Assurance and Safety.

284.    On June 7, 2017, Relator Taylor emailed to Dr. Van Wyck her resignation notice, effective September 4, 2017. Just as with Relator Holland, DaVita then began a smear campaign against Relator Taylor.

285.    DaVita issued to Relator Taylor a verbal warning, nearly identical to the one issued to Relator Holland, with a similarly unreasonable Corrective Action Plan that included due dates well past her resignation.

286.    Thereafter, all conversations with her supervisor Mr. Cline were required to be witnessed and memorialized by an email afterward.

287.    On June 23, 2017, and June 26, 2017, Relator Taylor met with Mr. Mohraz and discussed the concerns she raised in her resignation letter regarding DaVita's compliance issues.

288.    Relator Taylor also informed Mr. Carrington that she was concerned about DaVita's method validations.

289.    On June 16, 2017, after separate discussions with Dr. Van Wyck and DaVita's Vice President of Operations Steve Cramer, Relator Taylor sent an email to corporate leadership informing them that she had been unable to locate the method validation for peritoneal dialysate testing and recommending that the testing be sent to a reference lab.

290.    On June 28, 2017, Relator Taylor requested an update from her supervisor, Mr. Cline, regarding when and where the testing for peritoneal dialysate would be sent. In a follow-up meeting with her supervisor, Relator Taylor again indicated that the testing for peritoneal dialysate either needed to be sent out to a reference lab or suspended until validation was completed.

291.    Thereafter, Relator Taylor spoke with Dr. Van Wyck and Dr. Marty Schreiber, DaVita's Chief Medical Officer for Home Modalities, about the impact on patient care of suspending testing for peritoneal dialysate until validation was completed and how patients would be rescheduled. One hour after the conversation, Relator Taylor received an email informing her that DaVita would not be sending peritoneal dialysate fluids to a reference lab for testing and that no remedial action was going to be taken.

292.    This exchange exemplifies the pushback that Relators Holland and Taylor faced when attempting to make DaVita's processes compliant.

293.    Based upon DaVita's resistance to Relator Taylor's compliance efforts, which were a significant part of her job duties, and DaVita's continued efforts to besmirch her record, Relator Taylor informed Dr. Van Wyck on June 30, 2017, that she was moving her resignation effective date up to July 19, 2017.

294.    On July 3, 2017. Dr. Van Wyck instructed Relator Taylor to remain on call but not come to the laboratory or attend any meetings.

295.    DaVita wrongfully terminated and constructively discharged Relator Taylor because of her efforts to correct and stop continuing violations regarding DaVita's lack of method validations, of which DaVita was aware.

296.    As a result of DaVita's wrongful termination and constructive discharge, Relator Taylor was required to repay approximately $16,000 to DaVita for previously-provided relocation fees and has suffered substantial economic and non-economic damages.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

297.    Because Defendants Total Renal Laboratories, Inc. and DVA Laboratory

Services, Inc. are solely owned, managed, and controlled by and are alter egos of

Defendant DaVita, Inc., the acts of one are for the benefit of and can be imputed to the

other, and Defendant DaVita, Inc. cannot avoid legal responsibility for the actions taken

by Defendants Total Renal Laboratories, Inc. and/or DVA Laboratory Services, Inc.

### COUNT I

### Violation of the False Claims Act:
### Presentment of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

### (As to all Defendants)

298.    Relators incorporate by reference and re-allege the factual allegations stated in

Paragraphs 1-108; 109-223 (Failure to Validate Deviations from FDA-Approved

Instructions); 224-37 (Provision of False Information to Accrediting Entity); 238-46

(Fraudulent Inducement to Enter Government Contracts); 247-58 (DaVita's Knowledge

of Fraudulent Conduct); 259-64 (Materiality of DaVita's Fraudulent Conduct); 265-67,

272-74, and 279 (Retaliation Against Relator Holland); 281-82, 286-92, and 295

(Retaliation Against Relator Taylor); and 297 as if fully set forth herein.

299.    As set forth herein, Defendants, individually and by and through their agents,

officers, and employees, knowingly presented or caused to be presented to the United

States false or fraudulent claims for payment or approval under federally funded

programs in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

300.    Defendants knowingly submitted false or fraudulent claims, which arose from lab services that were materially misrepresented, to the United States in order to obtain payment or approval by the Government (i.e., through CMS Form 1500).

301.    The United States, unaware of the falsity of the claims submitted by Defendants and in reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims that it otherwise would not have paid.

302.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages in an amount to be proven at trial.

303.    By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the False Claims Act.

WHEREFORE, Relators Holland and Taylor, on behalf of the United States, demand judgment against Defendants, ordering that:

1.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of at least $11,181 and up to $22,363 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729 *et seq.*;

2.    Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

3.      Relators be awarded all costs and expenses of this action, including

attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other

applicable provision of the law;

4.      Relators be awarded pre- and post-judgment interest on the awards

ordered herein; and

5.      Relators be awarded such other and further relief as the Court may deem

to be just and proper.

## COUNT II

**Violation of the False Claims Act:**
**Submission of Material False Records or Statements**
**31 U.S.C. § 3729(a)(1)(B)**

**(As to all Defendants)**

304.    Relators incorporate by reference and re-allege the factual allegations stated in

Paragraphs 1-108; 109-223 (Failure to Validate Deviations from FDA-Approved

Instructions); 224-37 (Provision of False Information to Accrediting Entity); 238-46

(Fraudulent Inducement to Enter Government Contracts); 247-58 (DaVita's Knowledge

of Fraudulent Conduct); 259-64 (Materiality of DaVita's Fraudulent Conduct); 265-67,

272-74, and 279 (Retaliation Against Relator Holland); 281-82, 286-92, and 295

(Retaliation Against Relator Taylor); and 297 as if fully set forth herein.

305.    As set forth herein, Defendants, individually and by and through their agents,

officers, and employees, knowingly made, used, or caused to be made or used, false

records or statements material to numerous false and fraudulent claims in violation of the

False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

306.    Defendants submitted false records or statements to the United States, which were material to their false and fraudulent claims, by expressly and impliedly certifying their compliance (or failing to disclose their noncompliance) with all relevant federal regulations authorizing such payments when submitting claims for payment (i.e., through CMS Form 1500 and CMS Form 855B).

307.    Defendants also submitted false records or statements to the United States, which were material to their false and fraudulent claims, by knowingly misrepresenting that Defendants were entitled to payment and approval for lab services that were not rendered in compliance with all relevant federal regulations (i.e., through CMS Form 1500 and CMS Form 855B).

308.    The United States, unaware of the falsity of the records or statements made by Defendants and in reliance on the accuracy thereof, paid monies to Defendants that it would not have paid, but for the false records or statements.

309.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages in an amount to be proven at trial.

310.    By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

WHEREFORE, Relators Holland and Taylor, on behalf of the United States, demand judgment against Defendants, ordering that:

1.   Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of at least $11,181 and up to $22,363 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729 *et seq.*;

2.   Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

3.   Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law;

4.   Relators be awarded pre- and post-judgment interest on the awards ordered herein; and

5.   Relators be awarded such other and further relief as the Court may deem to be just and proper.

## COUNT III

### Violation of the False Claims Act:
### Conspiracy to Present False Claims and Material False Records or Statements
### 31 U.S.C. § 3729(a)(1)(C)

### (As to all Defendants)

311.   Relators incorporate by reference and re-allege the factual allegations stated in

Paragraphs 1-108; 109-223 (Failure to Validate Deviations from FDA-Approved Instructions); 224-37 (Provision of False Information to Accrediting Entity); 238-46 (Fraudulent Inducement to Enter Government Contracts); 247-58 (DaVita's Knowledge of Fraudulent Conduct); 259-64 (Materiality of DaVita's Fraudulent Conduct); 265-67, 272-74, and 279 (Retaliation Against Relator Holland); 281-82, 286-92, and 295 (Retaliation Against Relator Taylor); and 297 as if fully set forth herein.

312.    As set forth herein, Defendants DaVita, Inc., formerly known as DaVita Healthcare Partners, Inc.; Total Renal Laboratories, Inc.; and DVA Laboratory Services, Inc., by and through their agents, officers, and employees, conspired to commit a violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C). *See United States v. Norman*, 2018 WL 264253, at *3 (M.D. Fla. Jan. 2, 2018) (citing *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031 (11th Cir. 2000)).

313.    Defendants conspired to knowingly submit false or fraudulent claims and/or false records or statements material to numerous false and fraudulent claims to the United States in order to obtain payment or approval by the Government (i.e., through CMS Form 1500 and CMS Form 855B).

314.    In order to present false or fraudulent claims and/or false records and statements material to numerous false and fraudulent claims to the Government in violation of the False Claims Act, Defendants knowingly agreed with each other to falsely certify compliance with all relevant federal and state regulations that authorize payment of claims by the Government; to fraudulently omit and/or misrepresent critical qualifying information (i.e., the inability to ensure accurate, reasonable, and necessary test results)

-83-

and other material facts regarding its noncompliance with all relevant federal and state regulations; to fraudulently obtain a CLIA certificate; to fraudulently induce the Government to enter into an enrollment contract and to pay money it otherwise would not have paid; and to fraudulently retain payments improperly received from Government payors.

315.    The United States, unaware of the conspiracy or falsity of the claims submitted by Defendants and in reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims that it otherwise would not have paid.

316.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered actual damages in an amount to be proven at trial.

317.    By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the False Claims Act.

WHEREFORE, Relators Holland and Taylor, on behalf of the United States, demand judgment against Defendants, ordering that:

      1.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of at least $11,181 and up to $22,363 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729 *et seq.*;

2.     Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

3.     Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law;

4.     Relators be awarded pre- and post-judgment interest on the awards ordered herein; and

5.     Relators be awarded such other and further relief as the Court may deem to be just and proper.

### COUNT IV

**Violation of the False Claims Act:**
**Concealing and Avoiding Repayment due the Government**
**31 U.S.C. § 3729(a)(1)(G)**

**(As to all Defendants)**

318.    Relators incorporate by reference and re-allege the factual allegations stated in Paragraphs 1-108; 109-223 (Failure to Validate Deviations from FDA-Approved Instructions); 224-37 (Provision of False Information to Accrediting Entity); 238-46 (Fraudulent Inducement to Enter Government Contracts); 247-58 (DaVita's Knowledge of Fraudulent Conduct); 259-64 (Materiality of DaVita's Fraudulent Conduct); 265-67, 272-74, and 279 (Retaliation Against Relator Holland); 281-82, 286-92, and 295 (Retaliation Against Relator Taylor); and 297 as if fully set forth herein.

319.    As set forth herein, Defendants knowingly concealed or knowingly and

improperly avoided or decreased an obligation to pay or transmit money or property to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

320.     Defendants retained improperly obtained payments, which arose from the submission of false or fraudulent claims for lab services that were materially misrepresented, from the United States and knowingly concealed and improperly avoided their obligation to repay the improperly obtained payments.

321.     By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages in an amount to be proven at trial.

322.     By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

WHEREFORE, Relators Holland and Taylor, on behalf of the United States, demand judgment against Defendants, ordering that:

1.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of at least $11,181 and up to $22,363 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729 *et seq.*;

2.    Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

3.    Relators be awarded all costs and expenses of this action, including

attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other

applicable provision of the law;

4.    Relators be awarded pre- and post-judgment interest on the awards

ordered herein; and

5.    Relators be awarded such other and further relief as the Court may deem

to be just and proper.

**COUNT V**

**Violation of the False Claims Act:**
**Retaliation Against Relator Holland**
**31 U.S.C. § 3730(h)**

**(As to all Defendants)**

323.    Relators incorporate by reference and re-allege the factual allegations stated in

Paragraphs 1-108; 109-223 (Failure to Validate Deviations from FDA-Approved

Instructions); 224-37 (Provision of False Information to Accrediting Entity); 238-46

(Fraudulent Inducement to Enter Government Contracts); 247-58 (DaVita's Knowledge

of Fraudulent Conduct); 259-64 (Materiality of DaVita's Fraudulent Conduct); 265-80

(Retaliation Against Relator Holland); and 297 as if fully set forth herein.

324.    As set forth herein, Defendants violated Relator Holland's rights pursuant to 31

U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance of

an action under the False Claims Act and other efforts to report and/or stop one or more

violations alleged in this action.

325.    Because of Relator Holland's lawful acts, he was subjected to retaliation in the

form of harassment, threats of termination, actual termination, and/or constructive discharge.

326.   Defendants' retaliatory conduct against Relator Holland is in violation of 31 U.S.C. § 3730(h).

327.   As a result of Defendants' actions, Relator Holland has suffered damages in an amount to be proven at trial.

328.   Defendants are jointly and severally liable to Relator Holland for economic and non-economic damages resulting from their wrongful retaliatory conduct.

WHEREFORE, Relator Holland demands judgment against Defendants, ordering that:

1.   Relator Holland be awarded all relief available pursuant to 31 U.S.C. § 3730(h) and/or any other applicable provision of law resulting from Defendants' retaliatory conduct, including but not limited to, reinstatement with the same seniority status that Relator Holland would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

2.   Relator Holland be awarded such other and further relief as the Court may deem to be just and proper.

**COUNT VI**

**Violation of the False Claims Act:**
**Retaliation Against Relator Taylor**
**31 U.S.C. § 3730(h)**

**(As to all Defendants)**

329.   Relators incorporate by reference and re-allege the factual allegations stated in

Paragraphs 1-108; 109-223 (Failure to Validate Deviations from FDA-Approved

Instructions); 224-37 (Provision of False Information to Accrediting Entity); 238-46

(Fraudulent Inducement to Enter Government Contracts); 247-58 (DaVita's Knowledge

of Fraudulent Conduct); 259-64 (Materiality of DaVita's Fraudulent Conduct); and 281-

96 (Retaliation Against Relator Taylor); and 297 as if fully set forth herein.

330.   As set forth herein, Defendants violated Relator Taylor's rights pursuant to 31

U.S.C. § 3730(h) by retaliating against her for lawful acts done by her in furtherance of

an action under the False Claims Act and other efforts to report and/or stop one or more

violations alleged in this action.

331.   Because of Relator Taylor's lawful acts, she was subjected to retaliation in the

form of harassment, threats of termination, actual termination, and/or constructive

discharge.

332.   Defendants' retaliatory conduct against Relator Taylor is in violation of 31 U.S.C.

§ 3730(h).

333.   As a result of Defendants' actions, Relator Taylor has suffered damages in an

amount to be proven at trial.

334.    Defendants are jointly and severally liable to Relator Taylor for economic and non-economic damages resulting from their wrongful retaliatory conduct.

WHEREFORE, Relator Taylor demands judgment against Defendants, ordering that:

1.    Relator Taylor be awarded all relief available pursuant to 31 U.S.C. § 3730(h) and/or any other applicable provision of law resulting from Defendants' retaliatory conduct, including but not limited to, reinstatement with the same seniority status that Relator Taylor would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

2.    Relator Taylor be awarded such other and further relief as the Court may deem to be just and proper.

### DEMAND FOR JURY TRIAL

Relators respectfully demand a trial by jury on all issues so triable.

Respectfully submitted, this 8th day of January, 2020.

_/s/ Michael J. Moore_
Michael J. Moore*
Georgia Bar No. 520109
C. Neal Pope
Florida Bar No. 0581453
Charles W. Byrd*
Georgia Bar No. 100850
Aimee J. Hall*
Georgia Bar No. 318048

Elizabeth S. White*
Georgia Bar No. 258844
**Pope, McGlamry, Kilpatrick, Morrison &**
**Norwood, P.C.**
3391 Peachtree Road, NE, Suite 300
P.O. Box 19337 (31126-1337)
Atlanta, GA  30326
(404) 523-7706
michaelmoore@pmkm.com
nealpope@pmkm.com
chuckbyrd@pmkm.com
aimeehall@pmkm.com
lizwhite@pmkm.com
efile@pmkm.com


Jill S. Schwartz
Florida Bar No. 523021
Christopher A. Pace
Florida Bar No. 676721
John M. Hunt
Florida Bar No. 91168
**Jill S. Schwartz & Associates**
655 West Morse Boulevard, Suite 212
Winter Park, Florida 32789-3745
(407) 647-8911
jschwartz@schwartzlawfirm.net
cpace@schwartzlawfirm.net
jhunt@schwartzlawfirm.net


Julie Bracker*
Georgia Bar No. 073803
Jason Marcus*
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
(770) 988-5035
Julie@fcacounsel.com
Jason@fcacounsel.com


*Admitted *Pro Hac Vice*

Attorneys for Plaintiffs-Relators